[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAY 30, 2008
THOMAS K. KAHN
CLERK

No. 07-12315
Non-Argument Calendar

_____

D. C. Docket No. 06-00231-CR-01-BBM-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JOHN TERRELL GREENE,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

**(May 30, 2008)**

Before TJOFLAT, BIRCH and BLACK, Circuit Judges.

PER CURIAM:

John Terrell Greene appeals his 70-month sentence which was imposed after

he entered a plea of guilty to conspiracy to make false statements on loan applications, in violation of 18 U.S.C. § 371, and to making false statements on loan applications, in violation of 18 U.S.C. § 1014. On appeal, Greene argues that the district court clearly erred by (1) finding that the loss amount from the mortgage fraud exceeded $1,000,000, (2) imposing a four-level sentencing enhancement based upon Greene's role in the offense, and (3) sentencing him to a 70-month term of imprisonment, which is unreasonable based upon his medical condition. Upon review of the record and the parties' briefs, we discern no error, and we AFFIRM.

## I. BACKGROUND

From June 2004 until January 2006, Greene participated in a conspiracy to procure loan proceeds and defraud mortgage lenders by falsifying information to assist unqualified borrowers in securing loans at inflated prices. Greene recruited Dick Smith, Charles Gould, Bobby White, Sean McLaughlin, and others into the conspiracy. Greene was responsible for establishing shell companies to use in furtherance of the scheme, creating fraudulent documents to support the loan application, and obtaining inflated appraisals for the properties. Greene recruited Smith to locate properties and straw buyers, and Smith received a commission at each closing. Greene recruited Gould to locate properties in South Carolina, and

2

Gould was also paid a commission. To obtain the loans, Greene used the personal and credit information of the straw buyers, as well as manufactured employment and asset information. At least ten different properties were purchased through this scheme.

After Greene pled guilty, the Probation Office prepared a Presentence Investigation Report and calculated the range of prison sentences available to Greene under the United States Sentencing Guidelines ("U.S.S.G."). Greene was assigned a base offense level of seven, pursuant to U.S.S.G. § 2B1.1. Pursuant to U.S.S.G. § 2B1.1(b)(1)(I), sixteen levels were added to the offense level because the loss amount exceeded $1,000,000 but was less than $2,500,000. Because the offense involved the use of sophisticated means, an additional two levels were added under U.S.S.G. § 2B1.1(b)(9)(C). Greene received a four-level enhancement pursuant to U.S.S.G. § 3B1.1(a), because he was found to be an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive. This resulted in an adjusted offense level of 29. Then, pursuant to U.S.S.G. § 3E1.1(a), Greene received a two-level downward adjustment for acceptance of responsibility, establishing a total offense level of 27. Greene's prior convictions gave him one criminal history point, so he was assigned a criminal history category of I. Based on his criminal history category of I and

total offense level of 27, Greene's guideline sentencing range was 70 to 87 months of imprisonment. The statutory maximum for violating 18 U.S.C. § 371 is 5 years of imprisonment, and the statutory maximum for violating 18 U.S.C. § 1014 is 30 years of imprisonment.

Greene filed several objections to the PSI recommendations. Greene objected to several factual issues, stating: (1) the banks and mortgage companies obtained the appraisals on the properties, not Greene; (2) Greene did not direct Gould to locate houses; Gould contacted Greene to assist in transactions when he found a property to purchase; and (3) Synchro Technologies was a shell company established by Smith, not Greene. Greene objected to the 16-level enhancement resulting from the loss calculation. Greene argued that he should receive only a 14-level enhancement because, according to his calculations, the total loss amount did not exceed $1,000,000. Finally, Greene objected to the four-level enhancement for being an organizer or leader, asserting that many of the individuals involved in the transactions worked independently in their roles in the scheme.

At Greene's sentencing hearing, the government called Joseph Stites, a Special Agent with the Federal Bureau of Investigation, to testify and establish the loss amount for the contested properties based on his investigation of the fraud and his review of documents related to each transaction. Regarding the property

4

located at 6503 Ocean Boulevard, Special Agent Stites testified that Greene's shell company purchased the property for $549,000 and then the company sold the property to White, the straw buyer recruited by Greene. White purchased the property using a mortgage acquired in the amount of $775,000. Special Agent Stites testified that the original purchase price reflected the fair market value, so the intended loss was $226,000, which was the difference between the mortgage amount and the purchase price. On cross-examination, Stites testified that when the property sold for $837,000 in foreclosure eighteen months later, so the mortgage company actually made a profit. Based on this testimony, the government argued that, according to the Guidelines, the district court should use the greater of actual or intended loss. The court expressed concern that the numbers were "soft" as to the real value of the property when purchased. R4 at 42. Agent Stites testified that, according to South Carolina's property tax website, in August 2006, the fair market value was appraised at $512,300. Id. at 46. The court then found that the amount of loss was $226,000 based on the difference between the purchase price and the loan amount. Id. at 47.

With respect to the property located at 39 Cayman Loop, Special Agent Stites testified that he had discussed the transaction with Gould because Gould had been friends with the property owner, had brought the property to Greene's

5

attention, and had collaborated on the sale. According to Gould, the seller obtained an appraisal on the property in the amount of $485,000. However, for the transaction with Greene, they used a purchase price of $585,000 and obtained a mortgage for $585,000. On cross-examination, Special Agent Stites testified that although a foreclosure price would be the most reliable evidence of the property's fair market value, the property had been foreclosed upon. The court found that the loss amount was $100,000 based on the difference between the appraisal value and the inflated loan amount.

Regarding the property located at 91 Windy Lane, Special Agent Stites testified that a straw buyer recruited by Smith purchased the property for $798,000 using a mortgage for the entire value. Subsequently, the property went into foreclosure and was listed at a sale price of $573,800. Based on the difference between the loan amount and the list price, Special Agent Stites determined an estimated loss amount of $224,200. After the PSI had been prepared, Special Agent Stites contacted the listing agent for the property who informed him that the property actually sold in foreclosure for $557,000, so the actual loss amount was $241,000. The government indicated that, "for the sake of ease," it would still use the lower amount in its calculations. Id. at 52. Greene testified that he used the difference between the list price and the mortgage to determine loss amount

6

because the property had not been foreclosed upon at the time, but he admitted that the situation was "a little different" now that he had the additional information about the foreclosure. Id. at 53. Notwithstanding the sale price of the house, the court found that the loss amount was $224,200.

Special Agent Stites testified that the property at 7430 Shadburn Ferry, was purchased in Tyndall's name using a mortgage in the amount of $844,000. The property sold in foreclosure for $805,000, and the bank reported an actual loss of $133,029 with the accumulated interest subtracted. Id. at 63. The actual loss reported by the bank included the cost of foreclosure such as the commission and seller costs. Greene, Smith, Tyndall, and Molina attempted a second transaction with this property, but it was not completed because they were arrested at the closing. In this transaction, Molina attempted to obtain a mortgage in the amount of $1,045,000 for the purchase of the property. Id. at 69. Special Agent Stites estimated the intended loss amount as the difference between the mortgage Molina sought and the value the property ultimately sold for during foreclosure. Id. Further, based upon a HUD statement for the property, a shell company owned by Greene was to receive $229,556 from the transaction based on a fraudulent lien placed on the property by Greene's company. Id. at 69-70. Over Greene's objection, the district court found the actual loss on the first transaction was

7

$130,386 because the real estate commission was a reasonably foreseeable pecuniary harm.  Id. at 64-68, 73-74, 93.  The district court found that the loss amount was $240,000 for the second transaction based on the difference between the mortgage amount and the foreclosure price.  Id. at 73.  The district court also stated that the fact that the transaction was interrupted by law enforcement does not prevent the intended loss from being accounted for in the calculations.  Id.

With respect to the 5 Gasparilla Drive property, Special Agent Stites testified that an e-mail sent from James Davies, a mortgage broker, to Greene discussed the need to provide information to validate Molina's employment and income to substantiate a loan price of $1,100,000 for the property.  Id. at 78-79.  The e-mail was sent a month before the arrests occurred and referenced a sales contract and a residential lease.  The sales contract was for the Gasparilla property and in the amount of $1,100,000, and the residential lease provided documentation of Molina's income.  Id. at 80.  On cross-examination, Special Agent Stites testified that Davies was a mortgage broker often used by Gould.  Id. at 81-83. According to his interview with Gould, Greene approached Gould and Davies about a proposed sale of the Gasparilla property to a buyer he had recruited.  Id. at 83-84.  Greene had yet to sign any documents related to the proposed transaction.  Id. at 84-85.

Greene argued that the amount of loss for 5 Gasparilla Drive was the

8

difference between the $625,000 sale price and the $650,000 mortgage obtained during the first transaction with Tyndall as the straw purchaser. Id. at 76. Greene argued that no substantial steps were taken in the second transaction, so intended loss was inapplicable. Id. at 78, 90. The government responded that the loss should be the intended loss from the attempted second transaction, which was $450,000. Id. at 76-77. Thus, the intended loss was the difference between the original loan and the value for which Greene intended to sell the property. Id. at 77-78. The court found that substantial steps had been taken in the second transaction based on the fraudulent contract that had already been prepared, the false documentation prepared to support Molina's income, and the fact that the contract indicated a closing date of March 30. Id. at 90-91. Accordingly, the district court attributed $450,000 to the loss amount for the property. Id.

For the properties not subject to objection, the district court adopted the loss amounts calculated in the PSI. Regarding the credit card transactions, Greene agreed that the loss amount would be $100,000, but argued that the transactions should not be included as relevant conduct. Id. at 94-95. The district court ruled that the conduct was relevant, and, thus, included the value in the loss calculation. Id. at 95-96. Based on the loss findings, the district court concluded that the total loss amount attributable to Greene was $2,171,902. Id. at 96-98.

Greene also argued that he should not receive the four-level enhancement for his role in the offense because the operation consisted of many people, and no individual controlled the whole operation. Further, Greene stated that he did not supervise Gould, the mortgage company, or the appraiser. According to Greene, to the extent that he had been an organizer or manager with respect to directing the straw buyers. Greene argued that, if he were found to be an organizer, the court could apply only a two-level enhancement because he had not directed five or more straw buyers. The government responded that the operation involved more than five participants, at least six different straw buyers, and was otherwise extensive, based on the number of properties involved and the large amount of money obtained. The government asserted that Greene was the leader of the organization because he brought the individuals together, recruited Smith and others, formed most of the shell companies that were used to create false employment records and place false liens on the properties, and received the largest amount of money from the fraud. As proof of his leadership, the government entered into evidence a document taken from Greene's briefcase that included instructions to his girlfriend on how to create false bank accounts to substantiate the records submitted with the loan application. The district court determined that Greene was an organizer in a conspiracy that both included five or

more participants and was otherwise extensive.

The government then argued for a sentence within the Guidelines range based on the duration of the crime and the harm it caused; Greene requested a sentence below the Guidelines because he suffered from stage-five renal failure and required a kidney transplant, and he asked the court to consider his attempts to cooperate with the government. Greene submitted his medical records and letters from friends and family, his wife addressed the court regarding Greene's good character and deteriorating health condition, and Greene personally expressed remorse for his actions, explained his medical condition, discussed his relationship with his family, and asked for a second chance.

Before imposing sentence, the district court indicated that the guidelines were advisory and that it had considered all the 18 U.S.C. § 3553(a) factors in arriving at Greene's sentence. Specifically, the district court referenced (1) the nature and circumstances of the offense; (2) Greene's history and characteristics, such as previous fraudulent activity not accounted for in his criminal history points; (3) the seriousness of the offense of mortgage fraud in terms of his threat to the community's financial stability; (4) the need to deter Greene from further criminal conduct and protect the public; and (5) the need to construct a sentence that would provide Greene adequate care and treatment. Based on these

considerations, the district court found that a sentence within the Guidelines was appropriate and sentenced Greene to 70 months of imprisonment. Greene reasserted his previous objections and objected to the reasonableness of the sentence.

## II. DISCUSSION

Greene's first argument on appeal is that the district court clearly erred in finding that the loss amount exceeded $1,000,000. Even though he objected to the loss calculations for five properties at his sentencing hearing, he only contests on appeal the losses related to two properties: the property located at 6503 Ocean Boulevard and the property located at 39 Cayman Loop.[1] Regarding the property located at 6503 Ocean Boulevard, Greene contends that the district court did not consider the fair market value of the property when determining the loss amount; as to the property located at 39 Cayman Loop, Greene maintains that the government could not provide a foreclosure price, the most reliable evidence of fair market value, and the district court erred by relying on testimony of an

---

[1] Without considering these two properties, the total loss amount in this case still would have exceeded $1,000,000 and justified the 16-level enhancement. The district court found that the total loss was $2,171,902. If the loss amounts for the two contested properties, $226,000 and $100,000, are subtracted, the loss amount still exceeds $1,000,000. Consequently, even if the district court had erred as to the loss attributable to these properties, such error would have been harmless. We address Greene's arguments to explain that the district court properly determined the amount of loss in this case.

appraisal amount without introduction of the actual appraisal.

We review a district court's amount-of-loss determination for clear error. United States v. Machado, 333 F.3d 1225, 1227 (11th Cir. 2003). "When a defendant challenges one of the bases of his sentence as set forth in the PSI, the government has the burden of establishing the disputed fact by a preponderance of the evidence" and "supporting its loss calculation with reliable and specific evidence." United States v. Liss, 265 F.3d 1220, 1230 (11th Cir. 2001) (quotations and citations omitted). However, a defendant's "failure to object to allegations of fact in a PSI admits those facts for sentencing purposes." United States v. Wade, 458 F.3d 1273, 1277 (11th Cir. 2006), cert. denied, ___ U.S. ___, 127 S. Ct. 2096 (2007). "The district court's factual findings for purposes of sentencing may be based on, among other things, . . . undisputed statements in the PSI, or evidence presented during the sentencing hearing." United States v. Polar, 369 F.3d 1248, 1255 (11th Cir. 2004). Furthermore, the Guidelines provide that, in determining any sentencing-related factual dispute, "the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy." U.S.S.G. § 6A1.3(a) (2006); see also United States v. Baker, 432 F.3d 1189, 1254 n.68 (11th Cir. 2005) (concluding that, post-

Booker, a sentencing court may still rely on "reliable hearsay."). Even if the district court erred in applying the Guidelines, we will not reverse the district court's ruling if the error was harmless. United States v. Foley, 508 F.3d 627, 634 (11th Cir. 2007). An error is harmless if it does not substantially affect a defendant's sentence. Id.

Section 2B1.1 of the Guidelines provides a 16-level enhancement for a fraud offense involving between $1,000,000 and $2,500,000 of loss. U.S.S.G. § 2B1.1(b)(1)(I)-(J). Application Note 3 to that section provides that the "loss is the greater of actual loss or intended loss." U.S.S.G. § 2B1.1, comment. (n.3(A)). "Actual loss" is defined as "the reasonably foreseeable pecuniary harm that resulted from the offense." Id., comment. (n.3(A)(i)). "Reasonably foreseeable pecuniary harm" is "harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense." Id., comment. (n.3(A)(iv)). "Intended loss" is defined as "the pecuniary harm that was intended to result from the offense," and includes "intended pecuniary harm that would have been impossible or unlikely to occur." Id., comment. (n.3(A)(ii)). If there is loss, but it reasonably cannot be determined, the court may "use the gain that resulted from the offense as an alternative measure of loss." Id., comment. (n.3(B)).

In the fraudulent loan application context, we have recognized that sentencing based on intended loss is appropriate even where no actual loss occurred. United States v. Menichino, 989 F.2d 438, 442 (11th Cir. 1993) (per curiam) (interpreting U.S.S.G. §2F1.1, which was incorporated into § 2B1.1 in a 2001 amendment). Furthermore, according to the Guideline commentary, in a case involving collateral, the loss may be reduced by "the amount the victim has recovered at the time of sentencing from disposition of the collateral, or if the collateral has not been disposed of by that time, the fair market value of the collateral at the time of sentencing." U.S.S.G. § 2B1.1, comment. (n.3(E)(ii)). The Guidelines expressly acknowledge that district courts are in a "unique position" to assess the evidence and make a "reasonable estimate" of the loss involved given the "available information," and that "the court's loss determination is entitled to appropriate deference." Id., comment. (n.3(C)); see United States v. Miller, 188 F.3d 1312, 1317 (per curiam) (11th Cir. 1999) (explaining that courts may reasonably estimate the amount of loss because "often the amount of loss caused by fraud is difficult to determine accurately.").

We conclude that the district court did not clearly err when calculating the two particular loss amounts to which Greene objects on appeal because those loss amounts reflected reasonable estimates supported by reliable and sufficient

evidence. With respect to the property located at 6503 Ocean Boulevard, Greene only objected to the method of calculating the loss amount. He did not object to the government's evidence regarding the purchase price for the property or the amount of the mortgage obtained by the straw buyer for the purchase. Because the property was initially purchased in an arms-length transaction from a third-party uninvolved in the conspiracy, it was not clear error to use that price as a proxy for the fair market value. See U.S.S.G. § 2B1.1, comment. (n.3(C)(i)). The district court then used the difference between the original purchase price and the amount of the mortgage obtained for the straw purchase as an estimate of the loss Greene intended to cause to the lender. R4 at 47; see Menichino, 989 F.2d at 441-42 (concluding that it was not clear error for the district court to use the difference between the value of a boat and the inflated loan amount to determine intended loss). Although the property sold at foreclosure for a price higher than the mortgage amount less than two years later, such that the lender did not suffer an actual loss, the district court did not clearly err by using the intended loss. See id. (intended loss is a reasonable estimate of the loss amount even when there is no actual loss); U.S.S.G. § 2B1.1, comment. (n.3(A)) ("loss is the greater of actual loss or intended loss").

Regarding the property located at 39 Cayman Loop, Greene objected that the

16

evidence of the property's fair market value was not reliable or specific. However, he did not object the method used to calculate the loss amount, which was to subtract the fair market value from the value of the fraudulently-obtained loan. The district court did not err in concluding that the government established the fair market value of the property by a preponderance of the evidence. At the sentencing hearing, Special Agent Stites testified that he had interviewed Gould regarding this property, and Gould told him that the seller obtained an appraisal of $485,000 on the property prior to selling it to Greene. See Baker, 432 F.3d at 1254 n.68 (a sentencing court may rely on hearsay to make sentencing determinations). Although the property had not sold in foreclosure, which would have provided an estimate of actual loss, the commentary to U.S.S.G. § 2B1.1 specifically direct that loss is the greater of actual or intended loss and should be determined based on "available information." U.S.S.G. § 2B1.1, comment. (n.3(A,C)). Special Agent Stites testified that a foreclosure sale would have been the most reliable evidence of the property's fair market value, but the property had not undergone foreclosure. The court found that the loss amount was $100,000 based on the difference between the appraisal value and the inflated loan amount. Since the district court did not have sufficient information to determine the actual loss, the district court did not err by using the intended loss as determined by the difference between the

17

appraised value of the house and the amount of the fraudulent loan.

B.  Greene's Sentence Was Properly Enhanced For His Role in the Offense

Second, Greene argues that the district court erred by imposing a four-level enhancement for role in the offense because the government failed to prove by a preponderance of the evidence that Greene was an "organizer" of criminal activity under U.S.S.G. § 3B1.1(a), and the evidence indicates that Greene played an equal or similar role in the offense as the other participants.  We review for clear error "a district court's upward adjustment of a defendant's Guidelines offense level due to his status as a leader or organizer under U.S.S.G. § 3B1.1."  United States v. Phillips, 287 F.3d 1053, 1055 (11th Cir. 2002).  "The government bears the burden of proving by a preponderance of the evidence that the defendant had an aggravating role in the offense."  United States v. Yeager, 331 F.3d 1216, 1226 (11th Cir. 2003).

The Guidelines provide for an increase in the offense level based on the defendant's role in the offense.  U.S.S.G. § 3B1.1.  A four-level increase is applied if the defendant "was an organizer or leader of a criminal activity that involved five or more participants."  U.S.S.G. § 3B1.1(a).  In making the aggravating-role determination, the district court should consider several factors, including "the exercise of decision making authority, the nature of participation in the

18

commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others."  U.S.S.G. § 3B1.1, comment. (n.4).

Greene's argument that he was not an organizer or leader, because the participants in the conspiracy worked independently and had roles equal to Greene's role, is not supported by the record.  First, the district court properly found that the conspiracy involved five or more individuals because the fraudulent mortgage transactions conducted by Greene, Smith, and Gould used seven different straw buyers.  Furthermore, according to the testimony from Special Agent Stites, Greene (1) recruited Smith to locate properties and recruit straw buyers; (2) recruited several of the straw buyers for particular transactions; (3) formed most of the shell companies that were used to create false employment records and place false liens on the properties; and (4) received the largest percentage of money from the fraudulent transactions.  Greene was responsible for falsifying and submitting documents, meeting with the sellers and straw buyers, placing liens on the properties, and negotiating with sellers to alter the purchase prices.  Although the record reflects that Smith and Gould independently located some properties, they

19

would bring those properties to Greene's attention and Greene would pay them smaller percentages of the proceeds for their participation. The fact that Smith also played a leadership role, because he recruited some of the straw buyers, does not diminish Greene's general leadership of the conspiracy. U.S.S.G. § 3B1.1, comment. (n.4) (recognizing that a conspiracy can have more than one organizer or leader).

Accordingly, the district court did not clearly err in applying a four-level enhancement for aggravating role because the conspiracy involved five or more participants, and the record reflects that Greene exercised decisionmaking authority regarding the scheme, recruited accomplices, claimed a right to a larger share of the fruits of the crime, exercised control over others participants, and created the false documents and liens used to carry out the fraud.

C. Greene's Sentence is Reasonable

Third, Greene asserts that his 70-month sentence is unreasonable because the district court failed to adequately consider Greene's medical condition, a required 28 U.S.C. § 3553(a) factor, when fashioning his sentence. "We review the sentence imposed by the district court for reasonableness." United States v. Talley, 431 F.3d 784, 785 (11th Cir. 2005) (per curiam). The Supreme Court clarified that courts of appeal are to review sentences for abuse of discretion. Gall v. United

States, ___ U.S. __, 128 S. Ct. 586, 597 (2007).

> [We] must first ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence-including an explanation for any deviation from the Guidelines range.

Id. To that end, the district court "should set forth enough to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decisionmaking authority." Rita v. United States, ___ U.S. __, 127 S. Ct. 2456, 2468 (2007). However, "nothing in [United States v. Booker, 543 U.S. 220, 125 S. Ct. 738 (2005)] or elsewhere requires the district court to state on the record that it has explicitly considered each of the § 3553(a) factors or to discuss each of the § 3553(a) factors." United States v. Scott, 426 F.3d 1324, 1329 (11th Cir. 2005). The § 3553(a) factors include:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; [3 the need for] deterrence; [4 the need] to protect the public; [5 the need] to provide the defendant with needed educational or vocational training [or] medical care; [6] the kinds of sentences available; [7] the [Sentencing Guidelines] range; [8 pertinent policy statement[s of] the Sentencing Commission; [9] the need to avoid unwanted sentenc[ing] disparities; and [10] the need to provide restitution to . . . victims.

18 U.S.C. § 3553(a).

21

If the district court's decision is procedurally reasonable, our analysis then turns to the substantive reasonableness of the sentence. Gall, 128 S. Ct. at 597. "[T]he party who challenges the sentence bears the burden of establishing that the sentence is unreasonable in the light of both [the] record and the factors in section 3553(a)." Talley, 431 F.3d at 788. Reasonableness review is "deferential," and "there is a range of reasonable sentences from which the district court may choose." Id. "[I]n reviewing the ultimate sentence imposed by the district court for reasonableness, we consider the final sentence, in its entirety, in light of the § 3553(a) factors[,]" rather than reviewing each individual decision made during the sentencing process. United States v. Martin, 455 F.3d 1227, 1237 (11th Cir. 2006). Furthermore, "[t]he weight to be accorded any given § 3553(a) factor is a matter committed to the sound discretion of the district court." United States v. Williams, 456 F.3d 1353, 1363 (11th Cir. 2006), abrogated on other grounds by, Kimbrough v. United States, ___ U.S. __, 128 S. Ct. 558 (2007). We ordinarily expect a sentence within the Guidelines' range to be reasonable. Talley, 431 F.3d at 788. "[W]e will only reverse a procedurally proper sentence if we are left with the definite and firm conviction that the district court committed a clear error of judgment in weighing the § 3553(a) factors by arriving at a sentence that lies outside the range of reasonable sentences dictated by the facts of the case." United

22

States v. McBride, 511 F.3d 1293, 1297-98 (11th Cir. 2007) (per curiam) (quotation and citation omitted).

In this case, the district court imposed a procedurally reasonable sentence. The district court correctly calculated the guideline imprisonment range. Greene argues that the district court did not consider his medical condition, but the record shows that, prior to imposing sentence, the district court reviewed Greene medical record, heard arguments from both Greene and the government regarding Greene's medical condition, and heard Greene's personal statement, which discussed his medical condition. Additionally, the district court specifically mentioned its consideration of the § 3553(a) factor addressing consideration of the defendant's medical condition, and noted that it was confident that the bureau of prisons could evaluate Greene's medical condition and provide the appropriate treatment. R4 at 122-25. Furthermore, prior to determining that sentence with the advisory Guidelines was reasonable, the district court explained its consideration of several of the other § 3553(a) sentencing factors, reviewed the PSI, and heard the parties's arguments.

Greene also has not established that his sentence is substantively unreasonable. His 70-month sentence is at the low end of the advisory Guidelines range, so we ordinarily would expect such a sentence to be reasonable. Talley, 431

F.3d at 788. Additionally, his sentence is well below the statutory maximum of 30 years of imprisonment. See 18 U.S.C. § 1014. Although Greene argues that the district court failed to give adequate weight to his medical history, the weight afforded to such factors is within the district court's discretion. See Williams, 456 F.3d at 1363. Thus, based on the record and the district court's consideration of several § 3553(a) factors, Greene has not met his burden of establishing that his sentence is not within the "range of reasonable sentences" from which the district court could have chosen. Talley, 431 F.3d at 788.

Accordingly, we conclude that Greene's sentence is procedurally reasonable because the district court properly calculated the advisory Guidelines range, considered the relevant § 3553(a) factors, including Greene's medical condition, considered Greene's arguments for a below-guideline sentence, and articulated a reasoned basis for its decision. Further, based on a review of the record and the district court's consideration of several of the § 3553(a) factors, Greene failed to meet his burden to establish that his 70-month sentence at the low end of the Guidelines range is substantively unreasonable.

### III. CONCLUSION

Greene appeals his 70-month sentence imposed after he pled guilty to conspiracy to make false statements on loan applications and to making false

statements on loan applications. The district court correctly found that the loss amount from the mortgage fraud exceeded $1,000,000, properly imposed a four-level sentencing enhancement based upon Greene's role in the offense, and sentenced Greene to a 70-month term of imprisonment, which was unreasonable notwithstanding his medical condition. Upon review of the record and the parties' briefs, we conclude that the district court properly calculated the amount of loss, that Greene's supervisory role in the offense justified a four-level sentencing enhancement, and that the 70-month sentence was reasonable.

**AFFIRMED.**