09-5091-cr
*United States v. Woolf Turk*

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

———————————————

August Term, 2010
(Argued: October 28, 2010;  Decided: November 30, 2010)
Docket No. 09-5091-cr

———————————————

UNITED STATES OF AMERICA,

*Appellee*,

-*v.*-

IVY WOOLF TURK,

*Defendant-Appellant*.

———————————————

BEFORE:  KATZMANN and HALL, *Circuit Judges*, and JONES,[1] *District Judge*.

———————————————

Appeal from a judgment of the United States District Court for the Southern District of

New York (Buchwald, *J.*), sentencing Defendant-Appellant Ivy Woolf Turk to 60 months'

imprisonment and ordering her to pay restitution in the amount of $29,660,192.36.  We hold that

———————————————

[1] Judge Barbara S. Jones of the United States District Court for the Southern District of
New York, sitting by designation.

1

the district court properly calculated the loss caused by the defendant's fraud and imposed a reasonable sentence.  AFFIRMED.

_____

MATTHEW L. SCHWARTZ, Assistant United States Attorney (Jesse M. Furman, Assistant United States Attorney, *on the brief*), *for* Preet Bharara, United States Attorney, New York, New York, *for Appellee*.

GERALD B. LEFCOURT (Sheryl E. Reich, Faith A. Friedman, *on the brief*), Gerald B. Lefcourt, P.C., New York, New York, *for Defendant-Appellant*.

_____

HALL, Circuit Judge:

Defendant-appellant Ivy Woolf Turk appeals the sentence imposed on her by the United States District Court for the Southern District of New York (Buchwald, *J.*) after she pleaded guilty to a single count of conspiracy to commit mail and wire fraud in violation of 18 U.S.C. §§ 1341, 1343, 1349.  The district court sentenced Woolf Turk principally to 60 months' imprisonment and ordered her to pay $29,660,192.36 in restitution to the victims of the mortgage fraud she perpetrated.

On appeal, Woolf Turk's main argument is that the district court, in applying the United States Sentencing Guidelines, erred in calculating the amount of loss that Woolf Turk's fraud caused.  Specifically, she argues that the loss amount should be treated as zero because, at the time her fraud was discovered, there was still market value in the real property that purportedly collateralized the loans she had fraudulently obtained, and if that property had been sold before the collapse of the housing market, her victims could have been made whole.  She also argues

2

that the district court erred in: (1) finding that there were more than 50 victims ; (2) failing to conduct an individualized assessment of the factors in 18 U.S.C. § 3553(a); and (3) imposing a substantively unreasonable sentence.

For the reasons that follow, we emphatically reject Woolf Turk's principal argument. We also find no merit in her other claims of error, and thus affirm her sentence.

## BACKGROUND

Except where noted, the following facts are not disputed. Woolf Turk and her partner, Michael Hershkowitz, owned a real estate development company, the Kingsland Group, Inc., and several related entities (collectively, "Kingsland"). Between 2003 and 2007, Woolf Turk and Hershkowitz persuaded approximately 70 people, most of whom invested as individuals, to loan them a combined $27 million, purportedly for purposes of renovating sixteen apartment buildings in upper Manhattan, as well as the construction of another condominium in Manhattan and the purchase of a single-family home in Nassau County. Each loan required Kingsland to make interest payments on a monthly basis, with repayment to be made in full between 18 months and three years from the date of issuance. Woolf Turk and her partner told these individual investors that, as collateral for their loans, they would hold recorded first mortgages in the buildings. This was a lie. In truth, no mortgages were recorded for the individual investors (hereinafter, "the victims"), and they were — contrary to what they were led to believe when they agreed to "invest" with Woolf Turk — unsecured creditors. Woolf Turk and Hershkowitz also obtained loans from banks, and the liens securing those loans *were* recorded.

Woolf Turk's fraud was brazen. For example, as she admitted in open court when she pleaded guilty, she spoke in 2007 by telephone with one of the victims, who lived in Florida, and

3

told her that her investment had been secured by a first mortgage on the properties and that the mortgage had been recorded as promised. At the time she made this statement, Woolf Turk knew that no mortgages had been recorded for the individual investors. She also admitted attending investors' meetings in Manhattan at which she made similar false statements. Between April 2005 and May 2007, Kingsland began to default on the victims' loans, making interest payments on those that had not yet matured but failing to repay the outstanding principal on those that had come due. When some of the victims became suspicious and asked Kingsland to confirm that their mortgages had been recorded, Woolf Turk and Hershkowitz forged a recording sheet from New York City's Automated City Registration Information System ("ACRIS") and sent it to one of the victims, along with reassurances that the mortgages were in "first position" and that "[i]f anything were to happen to us, your group would own these properties and be able to refinance or sell [them] for an amount far greater than the amount of the mortgages." Presentence Report at ¶¶ 28, 29. That investor, however, checked ACRIS online and discovered that the ACRIS sheet sent by Woolf Turk was bogus.

From there, the scheme inexorably unraveled. A group of the victims filed a civil action against Kingsland in New York state court and obtained a *lis pendens*. Only then did they discover that not only were their loans unrecorded, but as unsecured creditors their interests in the properties (if any) were secondary to the recorded interests of banks — the precise opposite of the priority of interest Woolf Turk and Hershkowitz had assured them they possessed. What followed is unfortunate but not terribly surprising: attempts at settlement of the civil case failed because Kingsland could not promise the victims a substantial recovery of their investments, and, a day after Woolf Turk and Hershkowitz were arrested on fraud charges, a hedge fund called

4

Och-Ziff Real Estate Acquisitions, LLC ("Och-Ziff") withdrew from its contemplated purchase of some of the buildings. Kingsland went into involuntary bankruptcy proceedings. All of its holdings were liquidated for approximately $67.4 million, with $57 million used to repay the secured interests of the banks and most of the remainder used to pay bankruptcy costs and fees, taxes, utilities, and regulatory expenses. To date, the bankruptcy trustee has been able to distribute a little more than half a million dollars to all of the unsecured creditors combined. The result is that the victims have lost nearly all of the aggregate $27 million that they loaned to Woolf Turk.

The Government commenced this criminal case with the filing of a sealed complaint in July 2007. A superseding information filed in February 2009 charged Woolf Turk with a single count of conspiracy to commit wire fraud and mail fraud, in violation of 18 U.S.C. §§ 1341, 1343, 1349, and Woolf Turk pleaded guilty soon thereafter. There was no plea agreement, but in advance of the plea hearing the Government sent Woolf Turk a *Pimentel* letter[1] stating that, in its view: (1) the base offense level was 7, pursuant to U.S.S.G. § 2B1.1(a)(1); (2) a 22-level enhancement was warranted pursuant to § 2B1.1(b)(1)(L) because the loss amount was greater than $20 million but not greater than $50 million; (3) a 4-level increase was warranted pursuant to § 2B1.1 because the offense involved 50 or more victims; (4) a 2-level increase was warranted pursuant to § 2B1.1(10)(A)(ii) because the offense involved the use of an "authentication feature" (namely, forged the recording sheet from ACRIS that included the seal of the City of New York and purported to show that the nonexistent first mortgages had been recorded); (5) a

---

[1] *See United States v. Pimentel*, 932 F.2d 1029, 1034 (2d Cir. 1991) (encouraging the Government to "inform defendants [who are contemplating guilty pleas] . . . as to the likely range of sentences that their pleas will authorize under the Guidelines").

3-level reduction would be warranted for acceptance of responsibility; and (6) with the resulting offense level of 32 and a Criminal History Category of I, an advisory Guidelines range of 121 to 151 months' imprisonment would result. After conducting a hearing in accordance with Rule 11 of the Federal Rules of Criminal Procedure and hearing Woolf Turk's allocution to the basic facts of her fraud, the district court accepted her guilty plea.

The district court held a sentencing hearing in November 2009. Woolf Turk argued, in an extensive presentation by counsel, that "the foreseeable loss is the difference between the value of the properties on the day the fraud was found out and ceased." Sent. Tr. at 5. Woolf Turk's view was as follows: at the time the investors filed a civil suit and obtained a *lis pendens* against Woolf Turk and Hershkowitz in May 2007, the housing market was still stable enough that a deal could have been reached to cover her debts to both the institutional investors and the individual investors. In particular, defense counsel represented that by May 2007, there had been an agreement in principle for Och-Ziff to purchase Kingsland's Uptown portfolio for $66.5 million, which by defense counsel's calculations would value the total real estate portfolio at $87 million. Counsel added that Och-Ziff was open to the deal even after it learned of the fraud, and emphasized that whether or not that particular deal should have gone through, it served as "a mechanism to show the Court the value of the properties before the catastrophic events of later in the year and in the next year [i.e., the housing-market crash]." *Id.* at 9. Thus, reasoned Woolf Turk's counsel, it was the housing crash and other "extrinsic factors" that caused the individual investors' loss, and not Woolf Turk. *Id.* at 13.

A number of victims spoke at the sentencing hearing, explaining how Woolf Turk's fraud had devastated their lives, some describing how their losses had left them without retirement

6

savings or the ability to pay for health care or their children's education. Evan Schwartz, who with his late father had invested $3.8 million with Woolf Turk and Hershkowitz and lost it all, offered a particularly informative victim impact statement, explaining that he had been involved in negotiations for the Och-Ziff deal and believed it could never have gone through unless the victims had "joined in the fraud" by giving in to Woolf Turk and Hershkowitz's demands that they conceal from Och-Ziff that there was a *lis pendens* and that the individual investors' mortgages had not been recorded. *Id.* Schwartz explained that he had felt that he and the other individual investors were being asked to defraud Och-Ziff on an even larger scale than they themselves had been defrauded, and asked the court not to mitigate the sentence "on a theory that a victim might have recovered more if we had let the scheme continue unabated." *Id.* at 27.

The district court rejected Woolf Turk's argument. The court noted that, unlike a stock fraud, the victims had no opportunity to sell at even a loss, and there was likewise no opportunity to wait for a market correction. The district court also strongly agreed with the victims — whom it said had "eloquently and persuasively responded" to Woolf Turk's argument — that Woolf Turk had essentially asked them to join in her scheme. *Id.* The court "concur[red] with the [G]overnment that all these costs and risks were either the direct result of Ms. Woolf Turk's criminal behavior or were foreseeable to her." *Id.* at 51. The district court then read aloud a number of letters from victims, many of whom were elderly and had been completely relieved of their savings by the fraud.

The court agreed with the *Pimentel* letter that the Guidelines range was 121 to 151 months and that the loss amount was greater than $20 million, and, referring in general terms to the 18 U.S.C. § 3553 factors, imposed a below-Guidelines sentence of 60 months. The court

7

imposed a forfeiture in the amount of $27,184,750. The court added at the end of the proceeding that it was consciously imposing a non-Guidelines sentence that took into account the positive things Woolf Turk had done in her life. In an amended judgment, the restitution amount including interest was fixed at $29,660,192.36.

Woolf Turk timely appealed.

## DISCUSSION

I.      Standard of Review

We review a district court's sentencing decisions for both substantive and procedural reasonableness. *See United States v. Rattoballi*, 452 F.3d 127, 131-32 (2d Cir. 2006), *abrogated in part on other grounds by Kimbrough v. United States*, 552 U.S. 85, 108 (2007). "[W]e review a district court's conclusions of law *de novo*, its application of the Guidelines on issues of fact for clear error, and its exercise of discretion with respect to departures for abuse of that discretion." *United States v. Ebbers*, 458 F.3d 110, 126 (2d Cir. 2006).

In calculating loss amount, the obligation of the district court is to "make a reasonable estimate of the loss, given the available information." *United States v. Rutkoske*, 506 F.3d 170, 178 (2d Cir. 2007) (quoting former U.S.S.G. § 2F1.1 App. Note 9).[2] In reviewing the district court's determination, the court of appeals is obliged to "determine . . . whether the trial court's method of calculating the amount of loss was legally acceptable." *Id.* (quoting *United States v. Olis*, 429 F.3d 540, 545 (5th Cir. 2005)).

---

[2] Although U.S.S.G. § 2F1.1 no longer exists, the "reasonable estimate" standard has been re-codified at U.S.S.G. § 2B1.1 App. Note 3(C).

8

II.     Loss Calculation

Sentencing for the offense of conspiracy to commit wire fraud and mail fraud is governed by U.S.S.G. § 2B1.1.  By far the most consequential determination a district court must make when sentencing a defendant under this Guideline is the amount of loss caused by the defendant's crime, as this factor can increase the adjusted offense level by as few as zero or as many as 30 points, depending on the loss as measured in dollars.  *See* U.S.S.G. § 2B1.1(b)(1).  In this case, 22 points out of Woolf Turk's total offense level of 32 were attributable to the district court's determination that her fraud caused the victims to lose more than $20 million but not more than $50 million.  *See* U.S.S.G. § 2B1.1(b)(1)(L).  Under Application Note 3(A)(i), the "actual loss" for which a defendant is liable is "the reasonably foreseeable pecuniary harm that resulted from the offense."[3]  Furthermore, a defendant may receive a credit against the loss for which she is responsible in "the amount the victim has recovered at the time of sentencing from disposition of the collateral, or[,] if the collateral has not been disposed of by that time, the fair market value of the collateral at the time of sentencing."  App. Note 3(E)(ii).

We are unpersuaded by Woolf Turk's contention that the loss amount should have been treated as zero because the properties in which her victims thought they were investing arguably had some market value at the time her fraud was discovered.  Her argument fails because of its faulty premise, namely, that the victims' "loss" is the decline in value of what was promised as collateral (i.e., the buildings).  Rather, their loss is the principal value of the loans they made to Woolf Turk which were never repaid and which the buildings were supposed to have

---

[3] Where the "intended loss" is greater than the "actual loss," the amount of intended loss is used instead, *see* U.S.S.G. § 3(A), but there is no suggestion in this case that Woolf Turk *intended* any loss at all.

collateralized but never did. While purporting to lament that she did commit fraud in failing to record the individual investors' mortgages (despite falsely telling them she had done so and creating fraudulent documents to show that she had), Woolf Turk implicitly asks this Court to hold that she is to be punished only for the abstract moral wrong of saying one thing and doing another, and not for ruining lives as a potential, if admittedly not certain, result of that dishonesty. We reject that invitation.

To begin with, the buildings arguably were not collateral at all because the victims' mortgages were never recorded. Under New York law, an unrecorded mortgage on a given piece of real property is void as against any lien on the same real property that is recorded in good faith, such as those the banks held here. *See* N.Y. Real Prop. Law § 291; *see also Hudson Valley Fed. Credit Union v. N.Y. State Dep't of Taxation and Fin.,* 906 N.Y.S.2d 680, 686 (N.Y. Sup. Ct. 2010) (discussing effects of failure to record a mortgage). Collateral is "property subject to a security interest," BLACK'S LAW DICTIONARY (9th ed. 2009) (citing U.C.C. § 9-102(a)(12)), and the victims here held no such interest.

Of course, in a gentler universe where the housing market had gone up instead of down, Woolf Turk's victims might have recovered their losses anyway, through the successful completion of Woolf Turk's scheme, or some value might have remained in the properties at sentencing even after the satisfaction of other creditors. We need not resolve today whether, if such a preservation of value had occurred, Woolf Turk would have been entitled to treat the buildings as "collateral" with respect to the unsecured individual investors and thereby have invoked the credit-against-loss provisions of Application Note 3(E)(ii). Because the purported collateral had no meaningful value at the time of sentencing, we assume *arguendo* that it was

10

collateral, but worthless or nearly so.[4] As we shall explain, it remains the case that the victims'

*loss* was the unpaid principal, and we hold that the decline in value in any purported collateral

need not have been foreseeable to Woolf Turk in order for her to be held accountable for that

entire loss.

The most persuasive opinion on point, cited by the Government, is the recent district

court decision in *United States v. Mallory*, 709 F. Supp. 2d 455 (E.D. Va. 2010). In *Mallory*, the

defendant, like Woolf Turk, was convicted on a single count of wire and mail fraud for

fraudulently inducing lenders to make loans. *Id.* at 455-56. In that case, the defendant defrauded

not individual investors but banks, using "fraudulent tax returns and employment and asset

verification letters" to portray unqualified borrowers as financially qualified "for home loans that

they otherwise would not have received." *Id.* at 456. "And when, not unpredictably, these

unqualified borrowers defaulted on their loans, the banks were left to recover whatever they

could through foreclosure sales, a process rendered even more unappealing from the banks'

perspective by the fact that the housing market was deteriorating through this time period." *Id.*

Like Woolf Turk, the defendant in *Mallory* "argued that he should not be held responsible for the

diminished foreclosure sale value of properties . . ., as the market downturn that caused the

---

[4] In Woolf Turk's Presentence Report, the Probation Department determined that
$7,017,290.13 remained from the bankruptcy sale. However, as previously noted, only a little
more than half a million dollars has been distributed to unsecured creditors, a group that includes
but is not limited to the victims in this case. In a case such as this where the collateral has been
sold before sentencing, the plain language of Application Note 3(E)(ii) suggests that a defendant
may receive credit only for the amount actually distributed to victims, rather than the amount
remaining for possible distribution. And in any event, even if the full proceeds remaining were
to be credited against the loss caused by Woolf Turk's fraud, it would have been an insufficient
credit to push the adjusted loss amount below $20 million, and her offense level would have
remained the same.

decrease in value was not reasonably foreseeable to him at the time of his fraudulent conduct."

*Id.*

The *Mallory* court rejected the defendant's argument. The court held that calculating loss under § 2B1.1 required a two-step process: first, the determination of the foreseeable pecuniary harm resulting from the fraud, and second, the determination of any credits against loss from sale of the collateral, as required by Application Note 3(E)(ii). The court held that the only loss that need have been foreseeable to the defendant is the loss of the unpaid principal. *Id.* at 458-59. It explained:

> This approach — requiring foreseeability of the loss of the unpaid principal, but not requiring foreseeability with respect to the future value of the collateral — is not merely the best reading of § 2B1.1; it is also necessary to ensure that defendants who fraudulently induce financial institutions to assume the risk of lending to an unqualified borrower are responsible for the natural consequences of their fraudulent conduct. . . . Put another way, a defendant may not reasonably count on the expected sale value of collateral to save himself from the foreseeable consequences of his fraudulent conduct.

*Id.* at 459. We agree, and we apply the same rationale here. To accept Woolf Turk's argument would be to encourage would-be fraudsters to roll the dice on the chips of others, assuming all of the upside benefit and little of the downside risk.

Although we agree with the reasoning of *Mallory*, we recognize that it is not on all fours with this case. Default by a woefully unqualified home-loan borrower is so likely that, as the *Mallory* court recognized, the pecuniary harm in a case like *Mallory* will "almost invariably include the full amount of unpaid principal on the fraudulently obtained loan." 709 F. Supp. 2d at 458. Here, Woolf Turk may have had a greater chance, even a much greater chance, than the defendant in *Mallory* of seeing her scheme through to the point where she could have repaid the

12

individual investors their loans without even having to sell the collateral. On this basis, she

attempts to distinguish *Mallory*. But the Guideline does not hold defendants accountable only

for certain or near-certain losses, but for losses that were "reasonably foreseeable pecuniary

harm." § 2B1.1, App. Note 3(A)(i).

"Reasonably foreseeable pecuniary harm" is defined as "pecuniary harm that the

defendant knew or, under the circumstances, reasonably should have known, was a potential

result of the offense." § 2B1.1, App. Note 3(A)(iv). By definition, a potential result of being an

unsecured creditor is the loss of one's interest to the higher-priority interests of secured creditors.

That potential result is unremarkable if the unsecured creditors extend credit with full knowledge

that they bear the risk of total loss, but the crux of Woolf Turk's offense is that she obtained

loans by fraudulently leading unsecured creditors to believe that they were secured creditors.

Without this deceit, she could not have obtained her victims' money. It follows that a potential

direct result of Woolf Turk's specific fraudulent act was the total loss of the moneys the

individual investors had given her. That is enough to constitute "reasonably foreseeable

pecuniary harm."

Accordingly, under *Mallory* step one, the initial loss amount was the full principal of the

loans Woolf Turk fraudulently obtained. And under *Mallory* step two, it is irrelevant that some

theoretical value remained in the collateral at the time the fraud was discovered, because the

victims had no interest in the collateral and ultimately obtained no value from its sale, nor did

any value remain in the collateral at the time of sentencing. *See Mallory*, 709 F. Supp. 2d at 457-

58; U.S.S.G. § 2B1.1, App. Note 3(E)(ii) ("In a case involving collateral pledged or otherwise

provided by the defendant, [loss shall be reduced by] the amount the victim has recovered *at the*

13

*time of sentencing* from disposition of the collateral, or if the collateral has not been disposed of by that time, the fair market value of the collateral *at the time of sentencing*.") (emphasis added). As *Mallory* recognized, it cannot possibly be the case that the decline of the *collateral's* value must be foreseeable in order to calculate loss amount if the offset is set as of the time of sentencing, as the defendant can never know what the collateral's value will be at that arbitrarily chosen time. *See* 709 F. Supp. 2d at 458. Furthermore, as was the case in *Mallory*, all of Woolf Turk's arguments about the extrinsic forces that caused the value of the collateral to decline are simply irrelevant — they may or may not be true, and she might have earned a credit against loss if they had not occurred, but she may not invoke them to insulate her from responsibility for the loss she *caused*, namely, the loss of the unpaid loan principal. *See Mallory*, 709 F. Supp. 2d at n.4.

As the Government concedes, Woolf Turk's position finds "some support" in *United States v. Parish*, 565 F.3d 528, 535 (8th Cir. 2009), where the Eighth Circuit referred to loss in a mortgage fraud as "the amount of the fraudulently obtained . . . loans minus any payments made on the loan principal and the value of the collateral at the time of sentencing" and stated that "[t]he appropriate test is not whether market factors impacted the amount of loss, but whether the market factors and the resulting loss were reasonably foreseeable." As *Mallory* concluded, however, *Parish* is unpersuasive because the Eighth Circuit did not "adequately account for the plain language of Application Note 3, which states clearly that the credit against loss is equal to the actual amount recovered or recoverable at sentencing, without reference to the foreseeability analysis." 709 F. Supp. 2d at 459. Put another way, *Parish*'s statement of the law is wrong

14

because it conflates the initial calculation of loss (where foreseeability is a consideration) with the credits against loss available at sentencing (where it is not).  We decline to follow *Parish*.

Woolf Turk's reliance on two of our recent securities fraud cases, *United States v. Rutkoske*, 506 F.3d 170 (2d Cir. 2007), and *United States v. Ebbers*, 458 F.3d 110 (2d Cir. 2006), is also misplaced.  Those cases recognized that "[m]any factors may cause a decline in share price between the time of the fraud and the revelation of the fraud." *Rutkoske*, 506 F.3d at 179.  Thus, a sentencing court must determine "the extent to which a defendant's fraud, as distinguished from market or other forces, caused shareholders' losses." *Id.* (citing *Ebbers*, 458 F.3d at 127).  Contrary to the most frequently repeated contention in Woolf Turk's submissions, the Government is *not* trying to limit the application of the causation requirement to securities cases.  Woolf Turk's error again stems from her failure to recognize that the item of value lost by her victims was the unpaid principal of the loans, not the buildings themselves.  A loan cannot be compared to a stock because a stock is owned outright, with the assumption of upside benefit and downside risk, while a loan is merely the exchange of money for a promise to repay, with no assumption of upside benefit.  At any given time, the buildings in this case were nothing more than insulation against loss.

III.     Woolf Turk's Other Claims

Woolf Turk's remaining claims are without merit.  Her assertion that the district court erred in finding that her offense involved 50 or more victims draws upon the same reasoning as her argument that the loss amount is zero, and fails for the same reasons.  Upon review of the sentencing transcript, we are also satisfied that the sentencing court took more than adequate account of the § 3553(a) factors in, *inter alia*, stating the Guidelines calculation and range,

15

reviewing the offense conduct, reading extensively from various statements submitted by victims and supporters, acknowledging Woolf Turk's personal circumstances, and discussing the need for the sentence to reflect appropriately the seriousness of the offense and provide just punishment. We "will not conclude that a district judge shirked her obligation to consider the § 3553(a) factors simply because she did not . . . expressly parse or address every argument relating to those factors that the defendant advanced." *United States v. Fernandez*, 443 F.3d 19, 31 (2d Cir. 2006).

Finally, there is no question that the sentence imposed was substantively reasonable because it was securely within "the range of permissible decisions." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc). Indeed, in weighing both the severe impact of Woolf Turk's offense conduct on her many victims and the various mitigating personal circumstances of her life — and in light of the applicable Guidelines range of 121-151 months' imprisonment — the district court ultimately sentenced Woolf Turk to less than half of the lowest Guidelines sentence. We see no basis upon which to find that Woolf Turk's sentence was substantively unreasonable.

## CONCLUSION

We affirm the judgment of the district court.