09-3191-cr (L)
*USA v. Paul*

**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

August Term, 2010

(Argued: February 17, 2011          Decided: March 7, 2011)

Docket Nos. 09-3191-cr (L), 09-4147-cr (con)

————————————————————

UNITED STATES OF AMERICA
*Appellee*,

-v.-

STEPHEN M. GORDON, JEFFREY PITTSBURG, CHARLES KUSCHE,
JONATHAN GORDON
*Defendants,*

PETER PAUL
*Defendant-Appellant.*

————————————————————

Before:     CABRANES, CHIN, *Circuit Judges*, and CROTTY, *District
            Judge.*[*]

Defendant Peter Paul appeals from a judgment of conviction entered in

the United States District Court for the Eastern District of New York

(Wexler, J.) following his guilty plea to securities fraud in violation of 15

_____

[*] The Honorable Paul A. Crotty, District Judge of the United States District Court for the Southern District of New York, sitting by designation.

1

U.S.C. §§ 78j(b) and 78ff. Thereafter, Paul was sentenced to 120 months' imprisonment, three years of supervised release, restitution of $11,479,035.32 and a $100 special assessment. Paul now contends that the District Court (1) violated Federal Rule of Criminal Procedure 11(c)(1) by improperly participating in plea negotiations, (2) violated his right to speedy sentencing; and (3) erred in its ordering of restitution.

Affirmed.

> WINSTON Y. CHAN, Assistant United States Attorney (Susan Corkery, Assistant United States Attorney, *of counsel*), *for* Loretta E. Lynch, United States Attorney for the Eastern District of New York, *for Appellee*.
>
> HARLAN J. PROTASS, Clayman & Rosenberg LLP, New York, NY, *for Defendant-Appellant*.

CROTTY, *District Judge*:

## BACKGROUND

The evidence underlying the conviction, viewed "in the light most favorable to the prosecution," Jackson v. Virginia, 443 U.S. 307, 319 (1979), established the following facts. In 1998, Defendant Peter Paul ("Paul") and Stan Lee founded Stan Lee Media ("SLM"), an internet-based multimedia production company. As a co-founder and head of the company, Paul controlled a substantial amount of SLM stock. Paul placed portions of this

stock into nominee accounts at Merrill Lynch, Pierce, Fenner & Smith, Inc. ("Merrill Lynch") and Spear, Leeds & Kellogg, L.P. ("Spear, Leeds") that he fully controlled, but maintained under other names to mask his involvement.

Between 1998 and 2000, Paul and others began artificially inflating the price of SLM stock by effecting trades between the nominee accounts, thereby making SLM stock appear to be more liquid, and thus a less risky, investment. Additionally, Paul created a false appearance of higher than actual demand by directing others to execute uptick trades immediately prior to the daily close of public trading. In order to profit from the inflated stock price without having to sell his stock, Paul drew on his nominee accounts to obtain margin loans totaling $12.6 million. Paul induced Merrill Lynch and Spear, Leeds to make the loans by fraudulently creating the nominee accounts, as he could not have properly obtained the loans otherwise. Eventually, the plot collapsed and SLM's stock price began to decline steadily, falling to $0.13 per share in December 2000. As a result, the Securities and Exchange Commission opened an investigation into the trading of SLM stock.

In December 2000, Paul suddenly departed for Brazil. On June 8, 2001, a grand jury in the Eastern District of New York returned a two-count indictment charging Paul with conspiracy to commit securities fraud and securities fraud. Between August 2001 and July 2003, Paul was incarcerated

3

in Brazil, awaiting extradition to the United States. Paul was arraigned on September 15, 2003 and, on January 21, 2005, Paul was released on bail, subject to home detention and electronic monitoring.

On March 7, 2005, Paul pled guilty to Count Two of a two-count superseding indictment which charged Paul with securities fraud in violation of 15 U.S.C. §§ 78j(b) and 78ff. Paul remained in home detention with electronic monitoring until he appeared for sentencing more than four years later, on June 25, 2009. Ultimately, the District Court (Wexler, J.) sentenced Paul to 120 months' imprisonment, three years of supervised release, restitution of $11,479,035.32 and a $100 special assessment.

Paul appeals, arguing that the District Court (1) violated his Fifth Amendment right to speedy sentencing; (2) imposed an unreasonable sentence; (3) erred in its ordering of restitution; and (4) violated his Sixth Amendment right to a speedy trial. In a July 19, 2010 unpublished Order, we dismissed Paul's appeals relating to his right to a speedy trial and the reasonableness of the District Court's sentence because these appeals were barred by a waiver of appellate rights contained in Paul's plea agreement. On November 5, 2010, we granted Paul's motion for leave to file a supplemental letter brief asserting that the District Court violated Federal Rule of Criminal Procedure 11(c)(1) by improperly participating in plea negotiations. Paul's

Rule 11(c)(1) argument is not foreclosed by his appellate waiver because it goes to the question of whether he entered his plea agreement knowingly and voluntarily. See United States v. Pearson, 570 F.3d 480, 485 (2d Cir. 2009).

For the following reasons, Paul's conviction and sentence are AFFIRMED.

## ANALYSIS

### I. Federal Rule of Criminal Procedure 11(c)(1)

Rule 11(c) outlines the procedure that the government and defense counsel must follow in coming to a plea agreement, and Rule 11(c)(1) specifically states that "[t]he court must not participate in these discussions." Fed. R. Crim. P. 11(c)(1). This rule is in place because such discussion "inevitably carries with it the high and unacceptable risk of coercing a defendant to accept the proposed agreement and plead guilty." United States v. Bruce, 976 F.2d 552, 556 (9th Cir. 1992).

In his letter-brief, Paul argues that the "district court violated Rule 11(c)(1) when it made statements at a December 29, 2004 conference that," according to Paul, "were intended to pressure and coerce Mr. Paul into pleading guilty, thereby casting doubt on the voluntariness of Mr. Paul's guilty plea approximately two months later." Def.'s Letter-Br. 2. Specifically,

5

the District Court stated that:

> They're not going to go to trial once we set a real date. I know that. And I'm saying that on the record.
>
> Most defense lawyers know with me you go to trial, after whatever the guidelines are, you get. You plead, and I'm considered lenient, so they know that and every effort will be made to plead before me rather than go to trial.
>
> And they also know and let the Second Circuit know, I don't think that I've been reversed in a criminal trial in years. So you're going to have to find, the clients are going to have to be found not guilty before they can walk.

J.A. 293-94. Paul argues that these statements compared a potential sentence following a guilty plea with a potential sentence following a guilty verdict and, therefore, coerced him into entering his guilty plea.

In addition, Paul alleges that a remark made by the District Court regarding his twenty-five months of incarceration in Brazil — "if he doesn't have a plea, he's not getting credit for that time" — was coercive, "misleading[,] and misstate[d] the law." J.A. 298; Def.'s Letter-Br. 3. In making his argument, Paul points out that only the Bureau of Prisons has the ability to credit him for the time spent incarcerated in Brazil.

The government argues that the statements did not violate Rule 11(c)(1) because (1) Paul did not plead guilty until two months after the District Court made the statements, (2) Paul was not present when the

6

statements were made, and (3) the transcript of the proceeding at which the statements were made was sealed until several years after the guilty plea was entered.  In addition, the government argues that all of the cases cited by Paul involved much more egregious conduct than the statements made by the District Court in this case, and that, with respect to the first set of remarks, the District Court was simply stating the sentencing law in effect at the time.

The Second Circuit's only significant decision regarding Rule 11(c)(1) is United States v. Werker, 535 F.2d 198 (2d Cir. 1976), but the facts in Werker were particularly unusual — the defendant attempted to plea bargain directly with the court. Id. at 201, 205.  Some Circuits have indeed espoused a "bright-line" rule regarding remarks made by a trial court that touch on topics related to plea discussions.  See, e.g., United States v. Cano-Varela, 497 F.3d 1122, 1134 (10th Cir. 2007) ("[T]he court's comparison of a post-trial sentence to a post-plea sentence was inherently coercive."); Bruce, 976 F.2d at 555 ("The command of [Rule 11(c)(1)] with regard to plea negotiations is simple and admits of no exceptions.").  But a closer review of the relevant caselaw suggests that a more discriminating examination of the remarks at issue — and the context in which they were made — is the more prudent approach. We need not adopt a particular standard to apply to all potential 11(c)(1) situations.  It suffices simply to say that a "bright-line" rule is inappropriate

7

for such an analysis. Issues arising under Rule 11(c)(1) are highly fact-specific and, as a result, such "situations must be analyzed in terms of the purposes of the rule, and not with illogical rigidity." United States v .Moses, No. 05 Cr. 133, 2010 WL 3521724, at *15 (D.Vt. Sept. 7, 2010) (citing Cano-Varela, 497 F.3d at 1133-34; United States v. Frank, 36 F.3d 898, 902 (9th Cir. 1994)).

The statements made by the District Court were made at a bail hearing, where counsel and the court were trying to fashion a package that would facilitate Paul's release. The hearing was in chambers and under seal. Toward the end of the hearing, the District Court made the first remark to which Paul now objects. The discussion was not about Mr. Paul, however, but rather about a trial date for all defendants. The District Court made the observation that trial dates produce pleas because defendants gain an advantage by pleading. Paul did not hear the District Court's remarks because he was not present. Although it may be possible that his attorney conveyed the substance of the remarks to him, no fair-minded reader of the transcript at issue would conclude that the remarks rose to the level of a violation of Rule 11(c)(1).

This case is most analogous to United States v. Bierd, 217 F.3d 15 (1st Cir. 2000). In Bierd, the trial judge said, at sidebar and in the context of

8

discussing a co-defendant's motion for severance: "Why doesn't he plead out, get the three levels he's entitled to and then that will accomplish the severance, but that's not for me to say." Id. at 18. The defendant pled guilty the following day. Id. Given the circumstances, however, the First Circuit found that the trial judge's conduct was "not so egregious as to require vacat[ur] of the conviction." Id. at 20.

The first set of remarks made in this case are similar to the remarks in Bierd in context and in scope. In both cases, the comments were made in a context having little to do with plea discussions. And in both cases, the statements suggested that a guilty plea would cause a reduction in sentence — an accurate reflection of the sentencing law in effect at the time. As such, the First Circuit's common-sense conclusion that it "sense[d] a distinct qualitative difference between statements found to require vacat[ur] and the comments made" in Bierd guides our decision here. Id. at 21. The District Court's remarks were "impromptu, unemphatic, and unrepeated," id., and, therefore, did not violate Rule 11(c)(1).

The second remark made by the District Court is even less concerning, as Paul clearly takes this remark out of context. A review of the surrounding discussion clearly indicates that the District Court was actually trying to secure Paul's release on bail, not trying to coerce a plea. Specifically, the

9

District Court said "he's been over four years in jail. That's a long period of time." J.A. 298.  The Assistant United States Attorney then stated that Paul was "getting credit for every minute" of the time he had spent incarcerated. Id.  The District Court disagreed: "[n]o, he isn't." Id.  The rest of the conversation continued as follows:

> MR. DAVIS [Assistant United States Attorney]: Your Honor, in a negotiated plea, if we were to have a negotiated plea — and I've already conveyed this to [Paul's counsel] — we would specifically ask for a finding by the Court that the time that he spent in custody in Brazil was based solely on the extradition request.
>
> THE COURT: But if he doesn't have a plea, he's not getting credit for that time.
>
> MR. CONWAY [Paul's Counsel]: That's very possible.
>
> THE COURT: Generally, I'm not sure, but —
>
> MR. CONWAY: Right. It's been stated by the government do [sic] me, he's not entitled to that if he goes to trial, because it was his delay that caused it, not the government's.  But I don't know. I'm not making a determination.
>
> MR. CONWAY: It's certainly an issue, your Honor.
>
> THE COURT: Yes. It's an issue. So I'm leaning to see if I can get him out, but I want a little more security. Okay.
>
> MR. CONWAY: That's fine.

Id. 298-99.  Whether or not the District Court was correct or had the authority to comment on whether Paul would get credit for the time he spent

incarcerated is of no moment. Given the context of the remark, it was not coercive in any way, shape, or form. The District Court's comments begin and end with its concern about getting Paul released on bail. "The rule against judicial participation in plea bargaining protects the parties against implicit or explicit pressure to settle criminal cases on terms favored by the judge. It does not establish a series of traps for imperfectly articulated oral remarks." Frank, 36 F.3d at 903.

Even if the District Court's remarks constituted error (which they do not), such error was certainly harmless. Paul was not present when the remarks were made and he did not enter his guilty plea until several months following the proceeding at issue. Any coercive effect would have had to have been communicated to Paul by his counsel. Neither Paul nor his lawyer ever objected to the District Court's statements at any time prior to this appeal. Any suggestion that Paul's counsel was concerned about the potentially coercive effect of such statements is completely unfounded. Indeed, at Paul's change-of-plea hearing, when the District Court asked Paul whether he was "making the plea of guilty voluntarily and of [his] own free will," Paul answered, "[y]es," and when the District Court asked whether "anyone threatened or forced [him] to plead guilty," Paul answered, "[n]o." J.A. 322.

In sum, the District Court did not err in the circumstances presented

11

here.  Paul's requested relief is, accordingly, denied.

## II. The Right to a Speedy Sentencing

Since Paul did not raise an objection in the District Court relating to

his right to a speedy sentencing, we review his claim for plain error.  See

United States v. Keppler, 2 F.3d 21, 23 (2d Cir. 1993) (citing Fed. R. Crim. P.

52(b)).  In Johnson v. United States, the Supreme Court articulated the

standard for plain error review:

> [B]efore an appellate court can correct an error not raised at trial, there
> must be (1) error, (2) that is plain, and (3) that affect[s] substantial
> rights. If all three conditions are met, an appellate court may then
> exercise its discretion to notice a forfeited error, but only if (4) the error
> seriously affect[s] the fairness, integrity, or public reputation of judicial
> proceedings.

520 U.S. 461, 466-67 (1997) (citation and internal quotation marks omitted).

"[T]o determine whether a defendant has been deprived of [his] due

process right to a prompt sentencing, we must consider [1] the reasons for the

delay as well as [2] the prejudice to the accused." United States v. Ray, 578

F.3d 184, 199 (2d Cir. 2009) (citing United States v. Lovasco, 431 U.S. 783,

790 (1977)) (internal quotation marks omitted).  These considerations are not

evaluated independently as prongs in a multi-part test, but rather as "related

factors to be weighed in light of each other and the surrounding

circumstances." See id. 199-200.

12

*A. Reasons for the Delay*

In considering the reasons for the delay, the Supreme Court has instructed that "different weights should be assigned to different reasons." Vermont v. Brillon, 129 S.Ct. 1283, 1290 (2009) (citation omitted) (in the speedy trial context). While "deliberate delay to hamper the defense weighs heavily against the prosecution, more neutral reasons such as negligence or overcrowded courts weigh less heavily but nevertheless should be considered . . . ." Ray, 578 F.3d at 200 (internal punctuation omitted). Courts should also consider the extent to which the defendant should bear responsibility for the delay. See id.

In the instant case, a large portion of the roughly four year delay before sentencing was due to the government's inability to provide the Probation Department with certain evidence for calculating restitution and to allow a new Assistant United States Attorney to familiarize himself with the case. There is, however, no evidence to suggest that this was an intentional — or anything more than an inadvertent — delay. In any event, negligence on the part of the government does not weigh as heavily as would an intentional delay.

The fourth and final year of the delay, however, is attributable solely to

Paul's requests for adjournments. In addition, Paul repeatedly attempted to delay the beginning of his prison term even after receiving his sentence. As such, it is clear that Paul was in no immediate rush to receive his sentence or to begin serving it.

### B. Prejudice

"To prove a due process violation as a result of a sentencing delay, the prejudice claimed by the defendant . . . must be substantial and demonstrable." Ray, 578 F.3d at 200 (citing Perez v. Sullivan, 793 F.2d 249, 256 (10th Cir. 1986); United States v. Nelson-Rodriguez, 319 F.3d 12, 61 (1st Cir. 2003)). A defendant is prejudiced by a sentencing delay when imposing the sentence would interrupt his reintegration into the community "in a way that the immediate imposition of sentence would not have." Id. at 201.

Paul first argues that the uncertainty of his fate left him "in limbo" with respect to employment prospects and his ability to make future arrangements for his family. Indeed, delay in sentencing "postpones the commitment of the defendant to corrections facilities, may have a detrimental effect on rehabilitation, and suspends the appellate review of error." Ray, 578 F.3d at 198. These harms, however, inevitably accompany any delay in sentencing and do not, in and of themselves, satisfy the "substantial and

demonstrable" prejudice requirement.  See id. at 200.

Paul also contends that he took steps towards rehabilitation, such as reestablishing ties with his family and helping shareholders recover hidden assets from SLM.  In developing this argument, Paul attempts to draw a comparison between himself and the defendant in Ray.  This comparison, however, is unavailing.  The defendant in Ray waited fifteen years for her sentencing hearing. Ray, 578 F.3d at 187, 200.  Believing that her involvement with the criminal justice system was behind her, she obtained employment and paid taxes, married and raised a family, owned a home, and obtained higher education.  Id. at 201.  On the contrary, however, Paul waited four years for a sentencing hearing, all the while remaining in home detention.  Thus, at no time did Paul believe that the matter was behind him, nor did he have the opportunity to fully reintegrate into society.

Lastly, Paul claims that his incarceration was detrimental to his autistic son, who had become reliant on Paul during the interim period.  The son's doctor reported that the child was "very attached to his father," and voiced concern that Paul's incarceration might have a detrimental effect on the child. J.A. 457.  The doctor also, however, noted that the effect of Paul's incarceration could have been ameliorated by "allow[ing] some time to help prepare [Paul's son] for this transition." Id.  Given the several delays in Paul's

15

surrender date, Paul and his son undoubtedly had such a transition period.

In sum, Paul does not cite any authority to support a finding of prejudice for family circumstances and has not specifically shown how the delay has prejudiced him in this respect.

In <u>Ray</u>, the Court expressly emphasized the narrowness of its holding. <u>Ray</u>, 578 F.3d at 202. Specifically, the Court noted that "[e]ven substantial delays in sentencing do not in all circumstances amount to a due process violation, especially when a defendant has not requested timely sentencing and is unable to establish prejudice of the sort implicated here." <u>Id.</u> Paul's is not the "unusual case where the dictates of fundamental fairness clearly compel [the Court] to conclude that [the defendant's] rights were violated." <u>See</u> <u>id.</u>

Accordingly, Paul's requested relief is denied.

## III. Restitution Under the Mandatory Victims Restitution Act

At Paul's sentencing hearing, there was extensive discussion regarding restitution. According to the original Presentence Investigation Report ("PSR"), the total losses to all victims — including losses to individual investors and losses to Merrill Lynch and Spear, Leeds — was $28,596,827.23, but the only losses attributable to Paul's securities fraud

were the losses to the individual investors, totaling $15,945.849.47. The government conceded, however, that the losses to the individual investors could not be properly quantified, and therefore argued that the only restitution that could be properly imposed on Paul would be the losses to Merrill Lynch and Spear, Leeds, totaling $12,650,978.00. Later in the hearing, the probation officer noted that the $12,650,978.00 figure related to bank fraud and not the "security [sic] fraud that [Paul] pled guilty to." J.A. 400. As a result of this confusion, the Court reserved decision on the restitution issue.

The Court held restitution hearings on July 15, 2009 and July 23, 2009. By then, the Probation Department concluded that it had erred in not including the total losses that Merrill Lynch and Spear, Leeds sustained. Accordingly, the District Court imposed restitution to Merrill Lynch in the amount of $3,828,057.56 and to Spear, Leeds in the amount of $7,650,977.76.

We review restitution orders "deferentially" and will reverse only for abuse of discretion. United States v. Pearson, 570 F.3d 480, 486 (2d Cir. 2009). "To identify such abuse, [the Court] must conclude that a challenged ruling rests on an error of law, a clearly erroneous finding of fact, or otherwise cannot be located within the range of permissible decisions." Id. The Mandatory Victims Restitution Act ("MVRA") provides, in part, that in

17

sentencing a defendant convicted of certain crimes, including securities fraud, the court must order the defendant to pay restitution to any victim of the offense. 18 U.S.C. § 3663A(a)(1). The MVRA defines the term "victim" as:

> [A] person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern.

18 U.S.C. § 3663A(a)(2). In determining the proper amount of restitution, a court must keep in mind that "[t]he loss must be the result of the fraud." United States v. Rutkoske, 506 F.3d 170, 179 (2d Cir. 2007) (citing United States v. Ebbers, 458 F.3d 110, 128 (2d Cir. 2006)).

The pertinent question here is whether the losses to Merrill Lynch and Spear, Leeds can be considered losses resulting from the securities fraud to which Paul pled guilty. The Probation Department initially took the position that the loss to the financial institutions was the result of bank fraud, not securities fraud. In its Second Addendum to the PSR, however, the Probation Department "concluded that it erred" and changed its position based on Paragraph 26(d) of the Second Superseding Indictment which alleged:

> The offense affected financial institutions, and by committing the offense, the defendant PETER PAUL derived gross receipts in excess of $1 million.

18

PSR Second Addendum 1 (citing U.S.S.G. § 2F1.1(b)(8)(B) (2000)). As a result, at the time of the restitution hearings, the Probation Department and the government were in agreement that Paul was accountable for the losses to Merrill Lynch and Spear, Leeds.

Paul argues that Merrill Lynch and Spear, Leeds are not properly characterized as victims because their loss was not a direct and proximate cause of Paul's securities fraud. He contends instead that their loss was caused by (1) the declining stock price which left the institutions "without valuable collateral to use to recover funds loaned to [Paul]," and (2) bank fraud, including fraudulently obtained loans. Def.'s Br. 55-57. Specifically, Paul points out that the government conceded at the June 25, 2009 sentencing hearing that it could not establish a causal link between Paul's conduct and the drop in the price of SLM stock. According to Paul, it follows that there is no causal link between Paul's securities fraud and the loss to Merrill Lynch and Spear, Leeds, as he contends that their losses came solely as a result of the drop in share price.

The government responds, however, that the margin loans were "an integral part of the larger securities fraud." Gov't Br. 13. Without the loans, the government contends, Paul would not have been able to profit from the scheme without selling his holdings of SLM stock, an event that would have

19

depressed the share price.

As part of his allocution at the March 7, 2005 plea hearing, Paul explicitly admitted that:

> Beginning in approximately May 2000 and continuing through December 2000, I and others borrowed money on margin from Merrill Lynch via these nominee accounts, using my stock in the nominee accounts as collateral. In this way, I concealed from the investing public that I was leveraging and, in effect, liquidating a substantial part of my holdings in Stan Lee Media stock.

J.A. 324. Because these loans were admittedly a significant part of the greater fraud, the necessary "causal nexus" unquestionably exists between Paul's conduct, the margin loans, and the losses to Merrill Lynch and Spear, Leeds. The brokerage houses would not have made the loans to Paul had they known that the collateral for the loans was the stock he manipulated through the nominee accounts.

Paul, however, also argues that even if he is responsible for the losses to Merrill Lynch and Spear, Leeds, the District Court was required, under our decision in United States v. Rutkoske, 506 F.3d 170, 179 (2d Cir. 2007), to exclude from the amount of restitution any losses not caused by fraud. The restitution calculation in Rutkoske involved losses to investors as a result of a collapse in the price of the stock involved in the defendant's fraud. Id. at 178-80. Because "[m]any factors may cause a decline in share price between the

20

time of the fraud and the revelation of the fraud[,]" id. at 179 (citing Ebbers, 458 F.3d at 128), and because the district court failed to consider such factors, the court remanded the case for a recalculation of the loss amount. Id. at 180.

In the instant case, however, the loss to Merrill Lynch and Spear, Leeds was not caused by the decline in value of SLM stock but, rather, by the making of the loans in the first instance. For this reason, the instant case is more analogous to our decision in United States v. Turk, 626 F.3d 743 (2d Cir. 2010). In Turk, the defendant fraudulently procured $27 million in loans from seventy victims using a collection of buildings as collateral. Id. at 745. As a result of the collapse in the housing market, the value of the buildings dropped significantly. See id. at 744. In calculating the proper loss value, the Turk court found that "the item of value lost by [the defendant's] victims was the unpaid principal of the loans, not the buildings themselves. . . . At any given time, the buildings in this case were nothing more than insulation against loss." Id. at 751. As a result, "the decline in value in any purported collateral need not have been foreseeable to [the defendant] in order for her to be held accountable for that entire loss." Id. at 749.

The same logic guides us here. The fact that independent market forces may have contributed to the decline in SLM stock held by Merrill Lynch and Spear, Leeds is irrelevant to the restitution calculation, because the stock was

21

merely securing the fraudulently-obtained loans. The loss to the brokerage houses resulted from Paul's inducement of the loans, and it is for this loss that Paul must provide restitution.

Accordingly, the District Court did not abuse its discretion in imposing the restitution. The restitution order must, therefore, be affirmed.

## CONCLUSION

We have considered all of Paul's arguments on appeal and find them to be without merit. For the foregoing reasons, Paul's conviction and sentence are AFFIRMED.