# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 08-2794
_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | |
| v. | * | |
| | * | |
| Michael Alan Parish, | * | |
| | * | |
| Appellant. | * | |

_____

No. 08-2795

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | |
| v. | * | |
| | * | |
| Christopher David Troup, | * | |
| | * | |
| Appellant. | * | |

Appeals from the United States
District Court for the District
of Minnesota.

———————

No. 08-2796

———————

United States of America,                    *
                                             *
              Appellee,                       *
                                             *
       v.                                     *
                                             *
Ardith Ann Parish,                            *
                                             *
              Appellant.                       *
                     ———————————

                    Submitted: March 13, 2009
                      Filed: May 19, 2009
                        ———————

Before WOLLMAN, RILEY, and COLLOTON, Circuit Judges.
                        ———————

RILEY, Circuit Judge.

       On October 18, 2007, the government filed a four-count criminal information in the District of Minnesota charging Michael Parish (Michael), Ardith Parish (Ardith), Christopher Troup (Troup), and Parish Marketing and Development Corporation (PMDC), with various offenses committed during the execution of a mortgage fraud scheme. Count one charged Michael, Ardith, and Troup (collectively, defendants) with conspiracy to commit mail fraud in violation of 18 U.S.C. § 371, and counts two through four separately charged PMDC, Michael, and Troup with money laundering in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i) and 1957. On November 2, 2007, defendants pled guilty to the charged offenses. After a lengthy evidentiary

hearing, the district court[1] sentenced Michael to 156 months imprisonment, Ardith to 60 months imprisonment, and Troup to 120 months imprisonment. Defendants now appeal their sentences. We affirm.

## I.     BACKGROUND

Michael and Ardith, husband and wife, were the owners and officers of PMDC, a residential development corporation operating primarily in the southern suburbs of Minneapolis and St. Paul, Minnesota. From 1980, when PMDC was incorporated, until 2007, PMDC built thousands of homes. Michael served as PMDC's president, while Ardith worked as the company bookkeeper. Michael and Ardith also employed their son-in-law, Troup, who worked as an agent of PMDC.

Beginning in 2004, PMDC began to encounter substantial financial problems. When PMDC could not find buyers for the homes PMDC built, defendants began applying for mortgage loans in the names of various straw buyers.[2] Defendants solicited family members and friends to act as straw buyers. Some of the straw buyers were offered incentives, such as a payment of $2,000 for the use of their name and credit information, which defendants would then use to obtain a fraudulent loan.

The straw buyers, except for Troup, did not view the homes they were purchasing, they did not negotiate the purchase price of the homes, and they often did not execute the required sale and loan documents. Instead, the documents were typically signed by defendants pretending to be the straw buyers. To ensure the straw buyers would be issued the loan proceeds, defendants often manufactured false documentation and inflated the assets of the straw buyers. For example, defendants

[1]The Honorable Ann D. Montgomery, United States District Judge for the District of Minnesota.

[2]A straw buyer is a person who obtains a loan for the purchase of property the straw buyer never intends to own or occupy.

would provide false documentation stating the straw buyers were employed by a company owned by Troup, or the straw buyers had other assets which the straw buyers did not actually possess.

In addition to inflating the assets of the straw buyers, Troup also provided false information to appraisers, such as false rental agreements overstating the amount of rent generated each month by the property. This resulted in appraisals which exaggerated the market value of the homes, and permitted defendants to obtain mortgage loans for an amount which exceeded the value of the homes.

In total, defendants used straw buyers to obtain mortgage loans fraudulently on approximately 208 properties, chiefly in the cities of New Prague, New Market, and Lonsdale, Minnesota. Defendants obtained nearly $100 million in fraudulent loan proceeds, with PMDC receiving over $25 million from the scheme. The vast majority of the loan proceeds obtained by PMDC were used to perpetuate the conspiracy. Because the straw buyers did not intend to have any financial responsibility over the homes, PMDC was responsible for making mortgage payments on all of the properties obtained with fraudulent loans. In order to pay on one loan, defendants would simply take out another loan. Proceeds from one fraudulent sale were used to make payments to lenders from previous fraudulent sales. The scheme collapsed, and almost all of the properties went into foreclosure. At least four other individuals pled guilty to various charges stemming from the conspiracy.

The losses which resulted from the conspiracy were widespread and significant. Lenders lost millions of dollars on the mortgage loans which were given to straw buyers. Many of the properties were rented to individuals who were forced to vacate upon foreclosure. Other properties were sold to individuals on a contract-for-deed basis. These buyers were not informed of the circumstances, and many of them made large down payments on the contract or made extensive improvements to the property and were unable to recover their losses.

The cities of New Prague, New Market, and Lonsdale, Minnesota, also suffered large losses as a result of the conspiracy. Many new homes are currently sitting vacant, and this has required the communities to expend resources addressing issues such as lawn maintenance, vacant home maintenance, erosion control, drainage, flooding, deteriorating neighborhoods, vandalism, increased police patrols, and code enforcement. Additionally, several subcontractors and suppliers suffered losses when PMDC failed to compensate the subcontractors for their services or the suppliers for their goods. While others were losing money, defendants personally were able to obtain millions of dollars from the scheme in salaries and commissions.

Defendants were charged with conspiracy to commit mail fraud. Michael and Troup were also charged with money laundering. Defendants pled guilty to the charged offenses pursuant to a plea agreement, and acknowledged their involvement in a mortgage fraud scheme in which the mortgages were fraudulently obtained for the sale of over 200 properties to straw buyers. Under the plea agreements, the parties agreed to litigate several contested sentencing issues, including the amount of loss, the number of victims, and the appropriate role adjustments under the advisory United States Sentencing Guidelines (U.S.S.G. or Guidelines).

The district court held an evidentiary hearing on July 1, 2008, during which the government called eighteen witnesses and introduced numerous exhibits. Following the hearing, the parties submitted memoranda setting forth their respective arguments regarding the contested sentencing issues. On July 31, 2008, at defendants' sentencing hearing, the district court sentenced Michael to 156 months imprisonment, Ardith to 60 months imprisonment, and Troup to 120 months imprisonment. Each defendant was also sentenced to 3 years supervised release. Following an October 9, 2008 restitution hearing, the district court amended its previous judgment by ordering defendants to pay $5,467,705 in restitution.

Defendants now appeal their sentences alleging the district court erred in finding the amount of loss caused by defendants was between $20-50 million and in imposing a twenty-two level increase to defendants' advisory Guidelines range. Troup also complains the district court erred in concluding Troup was an organizer or manager in the conspiracy and in imposing a two level enhancement to Troup's sentence.

## II.   DISCUSSION
### A.   Troup's Role in the Conspiracy

Because the district court concluded Ardith was a minor participant in the conspiracy, the district court imposed a two level reduction to Ardith's base offense level under U.S.S.G. § 3B1.2(b).  In contrast, the district court concluded Troup was an organizer or manager of the conspiracy, and imposed a two level enhancement to Troup's base offense level pursuant to U.S.S.G. § 3B1.1(c).  Troup asserts his role in the conspiracy was comparable to Ardith's role in the conspiracy.  Therefore, Troup contends the district court erred in enhancing Troup's base offense level while reducing Ardith's base offense level.

"'We review the district court's decision to assess a sentencing enhancement based upon a defendant's role in the offense for clear error.'"  United States v. Guzman-Tlaseca, 546 F.3d 571, 579-80 (8th Cir. 2008) (quoting United States v. Johnson, 278 F.3d 749, 752 (8th Cir. 2002)).  "For a two-level managerial role enhancement to apply, it is only necessary that the defendant supervise or manage one other participant."  United States v. Jiminez-Gutierrez, 425 F.3d 1123, 1124 (8th Cir. 2005) (citation omitted).  "We construe the term 'manager' broadly under U.S.S.G. § 3B1.1."  Guzman-Tlaseca, 546 F.3d at 580 (citations omitted).

> When determining whether a defendant played a managerial role in an offense, application note four to section 3B1.1 directs the sentencing court to consider such factors as: the exercise of decision making authority, the nature of participation in the commission of the offense,

the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

Id. (internal marks omitted).

While Troup contests his sentence, Troup does not contest the facts as stated in his presentence investigation report (PSR) and adopted by the district court. Those facts demonstrate Michael and Ardith owned PMDC and Troup was an agent of PMDC. When PMDC began having trouble selling the houses PMDC built, Troup and the other defendants began selling the homes to straw buyers. Defendants, including Troup, forged the loan documents and provided false information to banks, substantially overstating the assets of the straw buyers. Troup was the principal straw buyer, and he personally purchased over 70 properties by providing false information in his loan applications. Troup also recruited several other people, including subcontractors and family members, to serve as straw buyers. When funding from the loans did not cover the conspiracy's expenses, Troup began providing false information to appraisers so PMDC could get loans on residential properties which were higher than the value of the homes. The vast majority of proceeds obtained in the conspiracy were used to further the fraud by building more homes to be sold through more fraudulent transactions. Proceeds from fraudulent sales were used to make payments to lenders on previous fraudulent transactions. The defendants, including Troup, personally received "a few million dollars from the scheme in salaries, commissions, and the payment by PMDC of personal expenses." In fact, Troup used some of the proceeds obtained through the mortgage fraud to purchase expensive vehicles and write personal checks.

During the evidentiary hearing, co-conspirators testified as to Troup's important role in almost every aspect of the conspiracy. Subcontractors testified Troup was consistently their main point of contact and supervised their work. Others testified

Troup solicited their participation in the scheme. Many of the victims dealt almost exclusively with Troup.

This evidence is sufficient to support the district court's conclusion Troup had a managerial role in the conspiracy. Based upon the evidence in the record, the district court reasonably could have concluded Troup (1) exercised decision making authority, (2) extensively participated in the offense, (3) recruited accomplices, (4) claimed the right to a larger share of the fruits of the crime than many other co-conspirators, (5) participated in planning and organizing the offense, (6) repeatedly participated in almost 200 fraudulent transactions in at least three separate cities, and (7) exercised control and authority over other co-conspirators. The district court's conclusion that Troup had a managerial role in the conspiracy warranting a two-level increase in Troup's base offense level was not clearly erroneous.

### B. Loss Calculation

The district court concluded the amount of loss resulting from the mortgage scheme was between $20-50 million. On appeal, defendants argue the district court erred in calculating the amount of loss because the court failed to consider market conditions. Defendants insist the amount of loss would not have been as high had it not been for the downturn in the economy in general and the housing market in particular, and defendants should not be responsible for losses "arising from external factors."[3]

"As recognized by the Guidelines, the damage wrought by fraud is sometimes difficult to calculate." United States v. Agboola, 417 F.3d 860, 870 (8th Cir. 2005).

---

[3]Troup also contends "the calculation in the PSR, even if taken on its own terms, does not accurately estimate loss." Contrary to Troup's assertion, the district court did not adopt the loss calculation in the PSR. The district court explained it "went carefully over the evidence from the evidentiary hearing [and] counsel's memorandum." As a result, this argument does not warrant further discussion.

For this reason, a district court is charged only with making "a reasonable estimate of the loss." United States v. Scott, 448 F.3d 1040, 1044 (8th Cir. 2006) (citations omitted). A court should base its loss estimate upon a preponderance of the evidence. See United States v. Boesen, 541 F.3d 838, 850 (8th Cir. 2008) (citations omitted). Because "[t]he sentencing judge is in a unique position to assess the evidence and estimate the loss based upon that evidence . . . [t]he court's loss determination is entitled to appropriate deference." U.S.S.G. § 2B1.1 app. n.3(C). Thus, we review a district court's loss calculation for clear error. Boesen, 541 F.3d at 850 (citations omitted).

As a general rule, the amount of loss is the greater of actual loss or intended loss. U.S.S.G. § 2B1.1 app. n.3(A); Agboola, 417 F.3d at 868. "'Actual loss' means the reasonably foreseeable pecuniary harm that resulted from the offense." U.S.S.G. § 2B1.1 app. n.3(A)(i). "'[R]easonably foreseeable pecuniary harm' means pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense." Id. § 2B1.1 app. n.3(A)(iv). In contrast, intended loss is "the pecuniary harm that was intended to result from the offense." Id. § 2B1.1 app. n.3(A)(ii). If the loss cannot reasonably be determined, a "court shall use the gain that resulted from the offense as an alternative measure of loss." Id. § 2B1.1 app. n.3(B). The Guidelines suggest several different factors courts may consider when estimating loss, including, among other factors, (1) "[t]he fair market value of the property taken," (2) "[t]he approximate number of victims multiplied by the average loss to each victim," and (3) "the scope and duration of the offense and revenues generated by similar operations." Id. § 2B1.1 app. n.3(C).

At the sentencing hearing, the district court found the amount of loss could reasonably be determined, and held the resulting loss was more than $20 million and less than $50 million. The court then added twenty-two levels to the base offense level for each defendant as directed under U.S.S.G. § 2B1.1(b)(1)(L). The district court did not explain how it was conducting its calculation, or upon what facts the

court was basing its finding. The court stated it was relying on the facts in the PSR and the evidence received during the evidentiary hearing. When Michael's counsel objected to the court's calculation of loss, the district court stated, "I just want to make clear to you I didn't adopt that finding based on something said in the presentence investigation. I went carefully over the evidence from the evidentiary hearing [and] counsel's memorandum." The district court added, "[T]he plea agreement itself admits that PMDC received in excess of $25 million in fraudulently obtained mortgage proceeds." This admission alone is sufficient to demonstrate loss in an amount over $20 million and would support the twenty-two level increase in defendants' Guidelines range.

The district court also concluded there were fifty or more victims of the fraud and increased each defendant's base offense level an additional four levels as required under U.S.S.G. § 2B1.1(b)(2)(B). While the parties do not appeal this finding, this finding is important for purposes of calculating loss. The government describes the various classes of victims as follows: "(1) the current mortgage holders; (2) the municipal entities in which the properties are located (New Prague; Elko/New Market; Lonsdale); (3) unpaid subcontractors; (4) individuals who purchased residences from straw buyers pursuant to a contract for deed[;] and (5) renters."

In order to determine the amount of loss suffered by the lending institutions, the Guidelines direct courts to reduce the amount of loss by "the fair market value of the collateral *at the time of sentencing*." U.S.S.G. § 2B1.1 app. n.3(E)(ii) (emphasis added). Other courts considering similar mortgage fraud cases have adopted this method of loss calculation. See, e.g., United States v. Goss, 549 F.3d 1013, 1017-20 (5th Cir. 2008); United States v. Greene, 279 Fed.Appx. 902, 908-09 (11th Cir. 2008) (unpublished); United States v. Abbey, 288 F.3d 515, 518-19 (2d Cir. 2002) (per curiam). Defendants argue this method of calculating loss is insufficient because it fails to take into consideration market factors which can impact loss. The appropriate test is not whether market factors impacted the amount of loss, but whether the market

-10-

factors and the resulting loss were reasonably foreseeable. See U.S.S.G. § 2B1.1 app. n.3(A)(i).

Defendants built approximately 200 houses, knowing most, if not all, of those houses could not be sold on the market. Instead of listing the homes for sale, defendants fraudulently obtained almost $100 million in mortgage loans to pay for the homes. Defendants knew, or at the very least, should have known, the conspiracy would eventually unravel leaving as many as 200 homes vacant and pending foreclosure. Defendants reasonably could foresee the depressing impact such an occurrence would have on the local markets and on these property values. The "reasonably foreseeable pecuniary harm" which resulted from defendants' conduct is defined as actual loss under the Guidelines. See U.S.S.G. § 2B1.1 app. n.3(A)(i). Because the government did not present any evidence on intended loss, the only proper estimate of loss is actual loss.

Pursuant to U.S.S.G. § 2B1.1, the equation used to calculate actual loss to the lenders is the amount of the fraudulently obtained mortgage loans minus any payments made on the loan principal and the value of the collateral at the time of sentencing. See U.S.S.G. § 2B1.1 app. n.3 (E)(i) and (E)(ii). The government submitted evidence to the district court that defendants fraudulently obtained 195 mortgage loans[4] from twenty-four separate lending institutions, resulting in defendants receiving approximately $85,020,128 in loan proceeds. Therefore, we take the amount of the loan proceeds—$85,020,128—and subtract the value of the 195 homes built by PMDC and used as collateral.

---

[4]While the facts demonstrate defendants fraudulently obtained 208 mortgage loans, a few of the properties upon which those loans were based were eventually sold. At the evidentiary hearing, the government submitted evidence on only 195 of the properties.

During the evidentiary hearing, the government submitted Exhibit 9, which provided an analysis of the market value of homes comparable to those built by PMDC. Using this exhibit, the government submitted evidence that the average current market value of the average comparable home totaled approximately $230,000. After multiplying the market value of a comparable home ($230,000) by the total number of properties (195), the approximate value of the collateral at the time of sentencing would have been $44,850,000. To obtain our loss estimate, we subtract the value of the collateral at the time of sentencing ($44,850,000) from the amount of the loan proceeds ($85,020,128). This results in a total loss estimate of $40,170,128.

The district court did not engage in such an analysis. The district court also did not discuss the amount of loss attributed to the remaining classes of victims. The financial injuries to subcontractors, suppliers, buyers, renters, other home owners, the affected cities, and others were real and considerable. While a detailed analysis of loss would have been beneficial for our review, the Guidelines make clear the district court was not required to calculate an exact amount of loss. Instead, the court was only required to estimate the loss. See United States v. McIntosh, 492 F.3d 956, 960-61 (8th Cir. 2007) ("'The district court's method for calculating the amount of loss must be reasonable, but the loss need not be determined with precision.'" (quoting United States v. Craiglow, 432 F.3d 816, 820 (8th Cir. 2005) (internal marks and citation omitted))).

When the district court made its findings, the court referenced the evidence it received during defendants' evidentiary hearing. The evidence presented at the evidentiary hearing was more than sufficient to support the district court's estimate of actual loss between $20-50 million. Even if the district court had used the amount gained by defendants as an alternative measure of loss as defendants suggest, the evidence was sufficient for the district court to determine the amount of gain to defendants exceeded $20 million, thus still requiring the twenty-two level increase to defendants' Guidelines range. Defendants gained and benefited from the millions of

dollars garnered to perpetuate their fraudulent scheme, further expanding the losses and the number of victims.  The district court did not clearly err in its loss calculation.

## III.   CONCLUSION

We affirm the judgment of the district court.

_____