FILED
United States Court of Appeals
Tenth Circuit

November 18, 2013

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

VICKI DILLARD CROWE, a/k/a
Vicki R. Dillard,

      Defendant-Appellant.

No. 12-1405

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. No. 1:10-CR-00170-MSK-1**)

---

K.A.D. Camara, (Michael Lee Wilson with him on the briefs), of Camara &
Sibley LLP, Houston, Texas, for Defendant-Appellant.

Robert Mark Russel, Assistant United States Attorney, (John F. Walsh, United
States Attorney, with him on the brief), Denver, Colorado, for Plaintiff-Appellee.

---

Before **BRISCOE,** Chief Judge, **O'BRIEN** and **PHILLIPS**, Circuit Judges.

---

**BRISCOE**, Chief Judge.

Defendant Vicki Dillard Crowe was convicted by a jury of eight counts of mail fraud, in violation of 18 U.S.C. §§ 1341 and 2, and eight counts of wire fraud, in violation of 18 U.S.C. §§ 1343 and 2, for her participation in a mortgage fraud scheme. The district court sentenced Crowe to a term of imprisonment of sixty months and ordered her to make restitution in the amount of $2,408,142.37. Crowe now appeals, arguing that the district court erred in calculating the amount of loss associated with her crimes for purposes of U.S.S.G. § 2B1.1(b), and in denying her motion for new trial, which alleged ineffective assistance on the part of her trial counsel. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm.

Crowe's challenge to the district court's calculation of loss raises an issue of first impression for our court: whether the concept of reasonable foreseeability applies to a district court's calculation of the "credits against loss" under § 2B1.1(b). As we discuss in greater detail below, we adopt the Second Circuit's reasoning in United States v. Turk, 626 F.3d 743 (2d Cir. 2010), and hold that the concept of reasonable foreseeability applies only to a district court's calculation of "actual loss" under § 2B1.1(b), and not to its calculation of the "credits against loss."

I

*Factual background*

In June 2004, Crowe, a resident of Denver, Colorado, sought to purchase a

home in Denver. To do so, Crowe "applied for . . . first and second mortgage[s] with Fieldstone Mortgage Company in the amounts of $155,550 and $27,450, respectively." ROA, Vol. 5 at 7 (presentence investigation report). The applications for the mortgages, both of which were signed by Crowe, stated falsely that Crowe was employed by King Soopers as a Front End Manager earning $4,166.66 per month. In fact, however, Crowe was unemployed at the time she submitted the applications. And, although Crowe had previously worked at King Soopers, she had actually earned only $16.06 per hour.

Between June 2004 and approximately December 2006, Crowe, with the assistance of Thadaus Jackson, purchased eighteen additional properties in the State of Colorado, with purchase prices ranging from $183,000 to more than $1,380,000. The residential loan applications that Crowe signed and submitted all "contained false job titles, inflated and fabricated employment income, inflated rental income, and/or inflated assets of . . . Crowe or her [then-]husband[, Jamaica Crowe]." Id. Further, twelve of the applications stated falsely that the properties at issue would serve as the primary residence for Crowe and her husband. Id. "On some of the applications, [Crowe] failed to disclose all of the properties that she had recently purchased." Id. at 7-8.

As part of the transactions for these property purchases, Crowe and Jackson persuaded the property sellers to falsely inflate the sale prices so that Crowe could receive the inflated portions of the sale prices as "up front" money at, or

3

shortly after, the closing of the purchase transactions. Id. at 8. Sometimes this "up front" money was falsely characterized as a payment to the broker. Other times, this "up front" money was falsely characterized as a payment to a remodeling company that was supposed to perform specified remodeling work on the subject property. The "remodeling company" that Crowe typically listed was Ester Home Improvements, a company that Crowe set up in order to disguise the fact that she was receiving the "up front" money. Crowe also created false Ester Home Improvement invoices for the transactions involving Ester Home Improvements. Crowe conceded that she never intended to spend the "up front" money on the remodeling projects listed in the false invoices. The total "up front" money that Crowe received at or after the closings was $943,332.70.

Crowe also refinanced several of these eighteen properties in order to obtain additional cash. The refinancing applications that Crowe signed and submitted "contained false job titles, inflated and fabricated employment income, inflated rental income, and/or inflated assets." Id. at 8.

Toward the end of 2006, one lender informed Jackson that Crowe had reached her purchasing limit and could not buy any more properties, and that additional property could be purchased in the name of Crowe's husband only if he was legally separated from Crowe. Jackson relayed this information to Crowe. Crowe, in response, filed a petition for legal separation from her husband in the District Court of Arapahoe County, Colorado. Shortly thereafter, Crowe

4

purchased two properties in her husband's name. Crowe then failed to appear for the initial status conference in the separation proceeding, and that proceeding was ultimately dismissed in January 2007 for lack of prosecution.[1]

Crowe established a company called Crowe's Nest Funding/Household LLC (Crowe's Nest) to purportedly manage the properties that she and her husband purchased. Crowe's Nest, however, never made a profit because the rental income that was received from the properties purchased by Crowe and her husband was insufficient to cover the mortgage payments owed on those properties.

At the time she purchased each of the properties, Crowe knew that the initial lending institutions were likely to sell the loans to secondary lenders.

*Procedural background*

After Crowe's scheme fell apart, she was indicted by a federal grand jury on eight counts of mail fraud, in violation of 18 U.S.C. §§ 1341 and 2, and eight counts of wire fraud, in violation of 18 U.S.C. §§ 1343 and 2. Crowe pleaded not guilty and the case proceeded to trial. At trial, Crowe asserted that she had acted without the intent to defraud. At the conclusion of all the evidence, however, the jury found Crowe guilty of all sixteen charges alleged in the indictment.

The probation office prepared and submitted to the district court and the

---

[1] The record indicates that Crowe and her husband subsequently divorced. The precise details of when that occurred, however, are not specified in the record.

5

parties a presentence investigation report (PSR). Id., Vol. 5 at 5. In calculating Crowe's offense level, the PSR imposed a base offense level of 7 pursuant to U.S.S.G. § 2B1.1(a)(1), and then imposed an 18-level increase pursuant to U.S.S.G. § 2B1.1(b)(1)(J) because "the loss exceeded more than $2,500,000, but [was] less than $7,000,000." ROA, Vol. 5 at 11. After imposing two additional adjustments (a 2-level increase for obstruction of justice, and a 2-level increase because the offense involved more than 10 victims), the PSR arrived at a total offense level of 29. Combined with a criminal history category of I, the PSR calculated a "guideline range of imprisonment [of] 87 to 108 months." Id. at 20. Crowe objected to several aspects of the PSR, including "the loss amount and . . . calculations." Id. at 53.

The district court held a sentencing hearing on September 27, 2012. Crowe's counsel argued "that the losses were not reasonably foreseeable to" Crowe, id., Vol. 3 at 2078, because "the last loan" Crowe received "was December of '06, and the [housing] market didn't really spiral downward until '07 and '08," id. at 2079. Consequently, her counsel argued, the district court should "revert to gain as a measure of the guideline factor." Id. More specifically, Crowe's counsel argued that her gain was "over 400 [thousand dollars] and under a million," and that the resulting increase in her offense level

6

should be "14 rather than 18."[2]  Id.

The government presented two witnesses to support the proposed loss calculations contained in the PSR.  The first was Susan Hendrick, an attorney in private practice who represented a bank in the foreclosure proceedings involving seven of the loans at issue.  Hendrick testified that Crowe, appearing pro se, vigorously defended all of the foreclosure proceedings.  According to Hendrick, Crowe filed counterclaims in every foreclosure action and thereby greatly increased the costs associated with the foreclosure proceedings.  Hendrick opined that Crowe knew foreclosure law better than most of the opposing attorneys Hendrick regularly encountered.  Further, Hendrick testified that, in the midst of the foreclosure proceedings, Crowe, either personally or through someone else, broke into each of the seven properties, rekeyed them, and rented them to someone else.

The government's second witness was Edward Kljunich, an inspector employed by the United States Postal Inspection Service.  Kljunich was assigned to investigate Crowe and her activities in May 2007.  Kljunich compiled a list of Crowe's financial institution victims and their associated losses.  Kljunich testified that, "for a majority of the loans [at issue], [he] was able to identify the actual unpaid principal balance for the first and . . . second [mortgages,] but on

---

[2] Crowe's counsel also objected to the PSR's proposed 2-level increase for obstruction of justice (based upon Crowe's testimony at trial).  The district court ultimately chose not to impose that enhancement.

7

several . . . was unable to obtain an unpaid principal amount for the second [mortgage]." Id. at 2134. Consequently, he testified, for the latter group of loans he "took the payments that [Crowe] made, that she made on the first mortgage, and assumed she made those on the second mortgage, and came up with a percentage figure and applied that to the second mortgage." Id. On cross-examination, Kljunich conceded that the real estate market imploded during the time period that the loans to Crowe were outstanding. Kljunich also conceded that he did not know whether any of the named financial institutions identified as victims had mortgage insurance on their loans.

Defense counsel presented no evidence, but instead argued that Crowe was a "naive" participant in the scheme, id. at 2163, who took out the loans thinking that the properties at issue would appreciate, id. at 2175. Relatedly, defense counsel argued that there was no evidence that it was reasonably foreseeable to Crowe that "downstream lenders would suffer losses." Id. at 2174.

The district court rejected defense counsel's arguments and suggested method of loss calculation. In doing so, the district court first noted that "[i]n mortgage fraud cases, such as this, the loss is the unpaid portion of the loan as offset by the value of the collateral." Id. at 2206. In turn, the district court concluded that "the Government ha[d] presented evidence of actual loss," and that it was therefore bound to "use[] actual loss as the basis for [its] determination of loss." Id. And, based upon the evidence presented by the government, the

8

district court found "that not only did [Crowe] know, but she should have reasonably known what the potential loss was." Id. at 2207. The district court explained:

> The contracts that [Crowe] signed included a promissory note that specified the amount that she owed. It included deeds of trust which – and this is a part of the reason why I wanted to see the entirety of the deeds of trust – were essentially form deeds of trust that identified the note, the amount that was owed, the loan amount, and what fees and costs she would be responsible for paying in the event she defaulted.
> So the reasonably foreseeable pecuniary harm is capped by the amount reflected in the deed of trust and the promissory note for each loan that . . . Crowe took out. To say that she did not understand that defies reason, because, as she has said multiple times, she intended to build this business to do good, and she intended to refinance these loans, and she knew she had obligations to pay, and she tried to make payments.

Id.

The district court rejected the argument asserted by Crowe's counsel "that some of these . . . loans . . . were assigned to downstream lenders and that in order for there to be reasonably foreseeable pecuniary harm, . . . Crowe had to know that these loans were assigned to particular lenders." Id. at 2208. In support, the district court noted that "[b]y the terms of the deed[s] of trust, . . . Crowe was advised that the promissory note[s] could be assigned to some other lender." Id. And, the district court noted, "regardless of whether it was the original lender or . . . a successor holder of the note and deed of trust, the reasonably foreseeable pecuniary harm remained the same, capped by the amount

9

owed or oweable under the promissory note and deed of trust." Id.

The district court also, in discussing the reasonable foreseeability of the loss, "note[d] that . . . Crowe filed for bankruptcy relief in a Chapter 7 case," and "[i]n the schedules and statement of affairs, which she submitted pro se [and signed under penalty of perjury], she identified her liabilities as $17,451,745.21." Id. at 2209.  By doing so, the district court concluded, Crowe "was representing to the Bankruptcy Court that she believed she had this sum as a debt which she sought to have discharged." Id.

Ultimately, the district court concluded, "based upon the evidence that [was] presented, that [it] [wa]s not necessary to quantify with exactitude the amount of the loss." Id.  Instead, the district court concluded, "[i]t [wa]s sufficient to say, based upon the evidence presented, that under Section 2B1.1 of the guidelines, that the loss here is . . . greater than $2,500,000 and less than $7 million, resulting in an increase in offense level of 18 levels." Id. at 2209-10.

Based upon this 18-level enhancement, the district court arrived at a total offense level of 27.   That total offense level, combined with Crowe's criminal history category of I, resulted in an advisory guideline range of 70 to 87 months. The district court chose to impose a below-Guidelines sentence of 60 months' incarceration.  The district court also imposed restitution in the amount of $2,408,142.37.

Crowe filed a pro se motion for new trial arguing, in pertinent part, that her

10

right to effective assistance of counsel was violated when her trial counsel entered into a stipulation with the prosecution regarding the jurisdictional element of the wire fraud counts. The district court denied Crowe's motion.

II

Crowe asserts two issues on appeal. First, she asserts that the district court erred in calculating the amount of loss for purposes of U.S.S.G. § 2B1.1(b). Second, she asserts that the district court erred in denying her motion for new trial, in which she asserted that she was deprived of the effective assistance of counsel when her trial counsel stipulated to an element of wire fraud over her express objection. We conclude, for the reasons outlined below, that both of these issues lack merit.

*The district court's calculation of loss under U.S.S.G. § 2B1.1*

Generally speaking, "sentences are reviewed under an abuse of discretion standard for procedural and substantive reasonableness." United States v. Gordon, 710 F.3d 1124, 1160 (10th Cir. 2013) (internal quotation marks and brackets omitted). "A sentence is procedurally unreasonable if," among other things, "the district court incorrectly calculates . . . the Guidelines sentence . . . [or] relies on clearly erroneous facts." Id. (internal quotation marks omitted).

"When a defendant challenges the procedural reasonableness of his sentence by attacking the district court's loss calculation, our task is to determine whether the district court's factual finding of loss caused by the defendant's fraud

11

is clearly erroneous." Id. at 1161 (internal quotation marks and brackets omitted). "In other words, we may disturb the district court's loss determination—and consequent Guidelines enhancement—only if the court's finding is without factual support in the record or if, after reviewing all the evidence, we are left with a definite and firm conviction that a mistake has been made." Id. (internal quotation marks omitted). "However, the district court's loss calculation methodology is reviewed de novo." Id.

In this case, the district court imposed a base offense level pursuant to U.S.S.G. § 2B1.1(a) and then imposed an 18-level enhancement pursuant to U.S.S.G. § 2B1.1(b). Section "2B1.1(b) increases a defendant's base offense level for fraud according to the amount of the loss." United States v. Washington, 634 F.3d 1180, 1184 (10th Cir. 2011). "The court is instructed to use the greater of actual or intended loss." Id. (citing U.S.S.G. § 2B1.1 cmt. n.3(A)). "If the loss is not reasonably determinable, then a court must use the gain that resulted from the fraud as an alternative measure." Id. (quoting U.S.S.G. § 2B1.1 cmt. n.3(B)). "The defendant's gain may be used only as an alternate estimate of that loss; it may not support an enhancement on its own if there is no actual or intended loss to the victims." Id. (internal quotation marks omitted).

*a) Reasonable foreseeability of the loss*

In challenging the district court's calculation of loss, Crowe argues, in part,

that because she, "the mortgage broker Jackson, and the lending institutions all wanted and expected the mortgages [at issue] to work out during the mid-decade real-estate boom, no loss was 'reasonably foreseeable' within the meaning of Comment 3(A) to" § 2B1.1. Aplt. Br. at 6. "Indeed," Crowe argues, "it was only because everyone involved in the boom expected the mortgages to work out that [she] was able to get them." Id. For example, she asserts, "[l]enders, faced with a rising market, believed that the homes they were lending on were adequate security and consequently did not do even the minimal employment or income verification that would have disqualified [her]." Id. Crowe in turn asserts that "[i]f the lenders and the mortgage broker, professionals in the business, did not foresee the 2008 collapse in the real-estate market, then it is not reasonable to expect that Crowe would have foreseen that collapse in 2004, 2005, or 2006, when she committed the alleged fraud." Id. at 6-7.

Crowe also argues that the district court erred "in jumping from the conclusion that [she] should have known that the loan amount was the maximum potential loss to the quite different conclusion that the difference between the outstanding loan amount and the foreclosure proceeds was 'the foreseeable pecuniary harm to the lenders.'" Id. at 7-8 (quoting ROA, Vol. 3, at 2208). More specifically, Crowe argues that "[t]he district court was correct to conclude that [she] knew what the maximum potential loss was, but wrong to conclude that this means that the actual loss was reasonably foreseeable by [her] when she applied

13

for the mortgages in 2004, 2005, and 2006." Id. at 8.  And, Crowe argues, "[b]ecause the district court used the wrong legal standard — maximum potential loss instead of reasonably foreseeable loss — this Court should remand for resentencing and instruct the district court to make a finding about what loss, if any, [she] could reasonably have foreseen." Id.

We conclude, however, that Crowe's arguments are contrary to the clear language of U.S.S.G. § 2B1.1 and its accompanying commentary.  Section 2B1.1(b)(1) states that a district court shall enhance a defendant's base offense level "[i]f the loss exceeded $5,000."  Depending upon the specific amount of the loss, this enhancement can range from 2 to 30 levels.  U.S.S.G. § 2B1.1(b)(1)(A)-(P).  Application Note 3 to § 2B1.1 fleshes out how the district court is to calculate "loss."  See generally Stinson v. United States, 508 U.S. 36, 38 (1993) (holding "that commentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline").  To begin with, Application Note 3 provides that, as a general rule, "loss is the greater of actual loss or intended loss."[3]  U.S.S.G. § 2B1.1 cmt. n.3(A).  In turn, Application Note 3 proceeds to define the phrase "actual loss."  "'Actual loss,'" it explains, "means the reasonably foreseeable pecuniary harm that resulted from the

---

[3] Because this appeal concerns only the issue of actual loss, it is unnecessary to review how the determination of intended loss is made.

14

offense." Id. cmt. n.3(A)(i). "'Pecuniary harm' means harm that is monetary or that otherwise is readily measurable in money." Id. cmt. n.3(A)(iii). And "'reasonably foreseeable pecuniary harm' means pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense." Id. cmt. n.3(iv). Notably, Application Note 3 treats amounts recovered by a fraud victim, such as the proceeds from a foreclosure sale, as "Credits Against Loss," rather than part of the initial "actual loss" calculation. More specifically, Application Note 3 provides that "[l]oss shall be reduced . . . [i]n a case involving collateral pledged or otherwise provided by the defendant, [by] the amount the victim has recovered at the time of sentencing from disposition of the collateral, or if the collateral has not been disposed of by that time, the fair market value of the collateral at the time of sentencing." Id. cmt. n.3(E)(ii). Thus, if we were to state the method for determining "loss" for purposes of § 2B1.1(b)(1) as a mathematical equation, it would be as follows: loss equals actual loss (or intended loss) minus credits against loss.

Importantly, for purposes of this appeal, the plain language of Application Note 3 makes clear that the concept of reasonable foreseeability applies only to a district court's calculation of "actual loss," and not to its calculation of the "credits against loss." Consequently, it is irrelevant in this case whether or not Crowe, at the time she negotiated the various mortgages at issue, reasonably

15

anticipated a precipitous decline in the real estate market that might result in the original lender or successor lenders being unable to recoup their losses from the sale of pledged collateral should she default. Instead, the only foreseeability issue in this case, and the one that the district court correctly focused on, is the amount of the potential pecuniary harm that might result from Crowe's offenses, i.e., the reasonable foreseeability of the "actual loss" (rather than the "loss") that occurred in this case.

We are not the first circuit to expressly adopt this interpretation of Application Note 3 to § 2B1.1. Rather, as the government notes in its appellate response brief, this interpretation was first adopted by the Second Circuit in Turk, following the lead of the district court in United States v. Mallory, 709 F.Supp.2d 455 (E.D. Va. 2010). Notably, the defendants in both Mallory and Turk raised arguments similar to the ones asserted by Crowe in this appeal.

The defendant in Mallory, Lloyd Mallory, was convicted by a jury "of conspiring to defraud lenders into issuing mortgage loans to unqualified homebuyers, many of whom subsequently defaulted on those home loans." 709 F.Supp.2d at 455-56. "At sentencing, the principal contested issue was the calculation of actual loss pursuant to § 2B1.1." Id. at 456. Lloyd "argu[ed] that the 'credit against loss' calculation should be based not on the actual amount recovered through foreclosure sales, but rather on the amount that [he], at the time of the fraudulent acts, reasonably could have expected to be recovered from

later foreclosure sales." Id. "Because [Lloyd's] fraudulent conduct occurred between 2006 and 2008, while the housing market was showing significant signs of weakness, but before the more dramatic collapse in housing prices in late 2008 and early 2009, [Lloyd] argued that he could not have foreseen that the defrauded banks would have recovered as little as they did from the foreclosure sales." Id. at 456-57. The district court rejected Lloyd's arguments, stating, in pertinent part, as follows:

> [Section] 2B1.1 treats the sale-of-collateral calculation as a separate and distinct analysis from the calculation of the reasonably foreseeable loss amount. It follows that this "credit against loss" provision does not require the amount of this credit to be reasonably foreseeable. To the contrary, the credit against loss provision emphasizes that the loss may be reduced only by the amount actually recovered or by the amount that is recoverable *at the time of sentencing*, whether or not the defendant had any idea what the collateral's value would be by that time. (citation omitted)

> Taken together, these provisions teach a two-step approach for calculating the loss attributable to a defendant in home loan fraud cases such as this one. The first step is to calculate the reasonably foreseeable pecuniary harm resulting from the fraud. This amount will almost invariably include the full amount of unpaid principal on the fraudulently obtained loan, as an unqualified borrower's default is clearly a reasonably foreseeable "potential result of the offense" within the meaning of Application Note 3(A)(iv). After all, the entire purpose of loan qualification criteria is to reduce the risk to banks that debtors will default on their loans. Fraudulent misrepresentations concerning borrowers' qualifications cause banks to assume a risk of default and, as discussed below, a risk that the value of the collateral will decrease. Neither of these risks would have been assumed by the lender in the absence of fraud. Accordingly, the loss of the unpaid principal is an eminently foreseeable consequence of the fraudulent conduct.FN3 Partial recovery of this loss through seizure and sale of collateral may

17

reduce the net loss amount through operation of the "credits against loss" provision, but it does not diminish the foreseeability of the financial institutions' loss of the unpaid principal amounts in the first instance.

> FN3. This analysis—that the loss of the full amount of unpaid principal was reasonably foreseeable because defendant's fraudulent conduct caused the lenders to assume the risk of a market downturn and the resulting decrease in the value of collateral—is consistent with the tort law proximate causation analysis.  Specifically, it has long been that "[w]here the . . . conduct of the actor creates or increases the foreseeable risk of harm through the intervention of another force, and is a substantial factor in causing the harm, such intervention is not a superseding harm."  Restatement (Second) of Torts § 442A (citing cases).

The second step in calculating the loss amount requires application of the "credits against loss" provision.  In applying this provision, courts must deduct from the calculated loss the amount actually recovered or actually recoverable by the creditor from sale of the collateral.  This calculation is made as of the time of sentencing and without regard for whether this amount was reasonably foreseeable by the defendant.  Where the financial institutions have sold the collateral, courts should credit the amount actually recovered in the sale.  Where the collateral is held by the institution at the time of sentencing, then the fair market value of the collateral at the time of sentencing is properly credited instead.  By operation of Application Note 3(E)(ii), it is irrelevant whether the diminished value of the credit against loss was reasonably foreseeable to defendant, as the loss of the entire amount of unpaid principal was a reasonably foreseeable potential consequence of defendant's conduct.  Accordingly, defendant is only entitled to a credit against loss in the amount actually recovered by the banks from sale of the subject properties.

This approach—requiring foreseeability of the loss of the unpaid principal, but not requiring foreseeability with respect to the future value of the collateral—is not merely the best reading of § 2B1.1; it is also necessary to ensure that defendants who fraudulently induce

18

financial institutions to assume the risk of lending to an unqualified borrower are responsible for the natural consequences of their fraudulent conduct. This is so because among the risks that a bank assumes in agreeing to issue a home loan is the risk that in the event of default, the foreclosure sale value of the home will be insufficient to allow recovery of the principal value due to market downturns or other events. In the lending institution's judgment, this risk is warranted only if the borrower satisfies certain employment, income, and asset requirements that render the likelihood of foreclosure sufficiently remote. Thus, by fraudulently misstating these factors, defendant and his coconspirators induced banks to assume the risk of a market downturn when the banks otherwise would not have assumed this risk with respect to the subject properties. Accordingly, irrespective of whether defendant could have predicted the foreclosure sale value of the subject properties at the time of sentencing, he should be held to account for the banks' actual losses as he fraudulently induced them to assume the risk that the value of the homes would decrease—a risk that was ultimately realized. Put another way, a defendant may not reasonably count on the expected sale value of collateral to save himself from the foreseeable consequences of his fraudulent conduct.

Id. at 458-59.

The defendant in Turk, Ivy Woolf Turk, "pleaded guilty to a single count of conspiracy to commit mail and wire fraud in violation of 18 U.S.C. §§ 1341, 1343, 1349," and was sentenced to "60 months' imprisonment and ordered . . . to pay $29,660,192.36 in restitution to the victims of the mortgage fraud she perpetrated." Id. at 744. On appeal, Turk's "main argument [wa]s that the district court . . . erred in calculating the amount of loss that [her] fraud caused." Id. More specifically, Turk argued "that the loss amount should have been treated as zero because the properties in which her victims thought they were investing arguably had some market value at the time her fraud was discovered." Id. at

19

748. The Second Circuit concluded that Turk's "argument fail[ed] because of its faulty premise, namely, that the victims' 'loss' [wa]s the decline in value of what was promised as collateral (i.e., the buildings)." Id. "Rather," the Second Circuit concluded, "their loss [wa]s the principal value of the loans they made to . . . Turk which were never repaid and which the buildings were supposed to have collateralized but never did." Id. In other words, the Second Circuit held, "the victims' *loss* was the unpaid principal, and . . . the decline in value in any purported collateral need not have been foreseeable to . . . Turk in order for her to be held accountable for that entire loss." Id. at 749 (italics in original).

In reaching these conclusions, the Second Circuit cited with approval, and ultimately adopted, the interpretation of § 2B1.1 and Application Note 3 outlined in Mallory. Id. at 750. And, the Second Circuit emphasized, "[t]o accept . . . Turk's argument would be to encourage would-be fraudsters to roll the dice on the chips of others, assuming all of the upside benefit and little of the downside risk." Id.

We agree with and adopt the reasoning expressed by the courts in Mallory and Turk. And, applying that reasoning in this case, conclude that the reasonably foreseeable pecuniary harm resulting from Crowe's fraud includes "the full amount of unpaid principal on the fraudulently obtained loan[s]." Mallory, 709 F.Supp.2d at 458. That is because Crowe, by fraudulently misrepresenting key information, including her job and income, "cause[d] [the] banks [at issue] to

20

assume a risk of default," and "the loss of the unpaid principal [on each loan] [wa]s an eminently foreseeable consequence of [her] fraudulent conduct." Id.

As a final matter, we pause briefly to address two of our prior cases that involved loss calculations under § 2B1.1. In the first of those cases, United States v. Mullins, 613 F.3d 1273, 1291 (10th Cir. 2010), the district court "calculated the financial loss attributable to [the defendant's] fraud" for purposes of § 2B1.1 by taking "the outstanding balances due on sixteen defaulted loans [the defendant] assisted in procuring and subtracted from each the foreclosure sale price when [the United States Department of Housing and Urban Development (HUD)] liquidated the mortgaged property." On appeal, the defendant challenged this method of loss calculation, arguing in part "that the proceeds HUD took in from liquidation sales . . . were unreasonably low and thus d[id]n't reflect the 'reasonably foreseeable pecuniary harm' attributable to her fraud." Id. at 1292. In support, the defendant noted that the appraisals conducted by HUD in apparent preparation for the liquidation sales were "significantly lower" than the appraisals that were first conducted when the defendant's clients purchased the properties. Id. The panel rejected this argument on the merits, concluding that "the district court's finding . . . that HUD's sale prices reflected the reasonably foreseeable pecuniary harm caused by [the defendant's] fraud" was not clearly erroneous. Id. at 1293.

Clearly, our conclusion in Mullins rests on the implicit assumption that the

21

concept of reasonable foreseeability applies to a district court's calculation of the credits against loss under § 2B1.1. But that threshold issue was neither placed directly at issue by the parties in <u>Mullins</u> nor explicitly decided by the panel. As a result, <u>Mullins</u> does not represent "binding precedent on this issue."[4] <u>United States v. Garcia-Caraveo</u>, 586 F.3d 1230, 1234 (10th Cir. 2009); <u>see</u> <u>United Food & Commercial Workers Union, Local 1564 v. Albertson's, Inc.</u>, 207 F.3d 1193, 1199-1200 (10th Cir. 2000) (refusing to grant precedential weight to a jurisdictional question assumed, but not explicitly decided, by a prior panel). In other words, "under our rule of deference to prior panel decisions, there is no holding on" the threshold issue "to which we must defer." <u>United Food</u>, 207 F.3d at 1200.

The concept of reasonable foreseeability was also mentioned briefly in <u>United States v. Washington</u>, 634 F.3d 1180 (10th Cir. 2011). There, the defendant argued, in part, "that the loss realized in the sale of the[] properties [at issue] [wa]s not attributable to his fraud and, therefore, not properly included in the loss calculation." <u>Id.</u> at 1185. We rejected that argument, holding that "in a mortgage fraud scheme such as this, the loss is not the decline in value of the collateral; the loss is the unpaid portion of the loan as offset by the value of the collateral." <u>Id.</u> We explained that "[a]lthough the victims of such a scheme may

---

[4] As the government correctly observes, <u>Mullins</u> was issued prior to both <u>Mallory</u> and <u>Turk</u>.

22

be able to recoup some of their loss by selling the collateral, the initial transactions would not have occurred let alone in the amount they did, but for perpetration of the fraud." Id. In short, our holding in Washington is entirely consistent with the interpretation of § 2B1.1 that we explicitly adopt in this opinion. Indeed, in Washington we quoted with approval the Second Circuit's statement in Turk "that 'a loan is merely the exchange of money for a promise to repay, with no assumption of upside benefit. At any given time, the buildings in this case were nothing more than insulation against loss.'" Id. (quoting Turk, 626 F.3d at 751).

To be sure, we also quoted in Washington the following statement from the Eighth Circuit's decision in United States v. Parish, 565 F.3d 528 (8th Cir. 2009): "'[t]he appropriate test is not whether market factors impacted the amount of loss, but whether the market factors and the resulting loss were reasonably foreseeable.'" 634 F.3d at 1185 (quoting Parish, 565 F.3d at 535). And Parish itself effectively held that the concept of reasonable foreseeability applies to a district court's calculation of the credits against loss under § 2B1.1.[5] Parish, 565 F.3d at 535. But we do not read Washington's quotation of Parish as an adoption of the Eighth Circuit's view of foreseeability as it relates to credits against loss.

---

[5] Notably, the Second Circuit in Turk openly criticized the Eighth Circuit's ruling in Parish and expressly declined to follow it on the grounds that its "statement of the law is wrong because it conflates the initial calculation of loss (where foreseeability is a consideration) with the credits against loss available at sentencing (where it is not)." Turk, 626 F.3d at 751.

23

To the contrary, the other relevant statements in <u>Washington</u> clearly suggest otherwise. And, in any event, like <u>Mullins</u>, that precise issue was neither placed directly at issue by the parties nor explicitly decided by the panel in <u>Washington</u>.

In conclusion, we hold that, in calculating the amount of "loss" for purposes of U.S.S.G. § 2B1.1(b), the concept of reasonable foreseeability applies only to a district court's calculation of "actual loss," and not to its calculation of the "credits against loss." Consequently, we reject Crowe's assertion that her sentence was procedurally unreasonable because the district court did not determine whether the proceeds ultimately realized from the foreclosures were reasonably foreseeable to her.

*b) Amounts paid by successor lenders to the original lenders*

Crowe also argues that "[t]he district court's calculation of loss [wa]s . . . incorrect under <u>United States v. James</u>, 592 F.3d 1109 (10th Cir. 2010)." Aplt. Br. at 8. <u>James</u>, Crowe argues, "holds that the loss of successor lenders is measured by 'the difference between what they paid the original lenders for the loans (less principal repayments by borrowers, if any) and what they received for the properties at the foreclosure sales, plus reasonably foreseeable expenses relating to the foreclosure proceedings.'" <u>Id.</u> at 9 (quoting <u>James</u>, 592 F.3d at 1115). "Because the Government [in this case] did not present evidence about what the successor lenders paid for the mortgages," Crowe argues, "this Court should remand with instructions to use a loss amount of zero for purposes of

24

[U.S.S.G. §] 2B1.1." Id.

As the government notes in its appellate response brief, however, Crowe did not raise this argument before the district court. Instead, Crowe argued only that the successor lenders were not reasonably foreseeable victims. Consequently, Crowe's argument is subject to review only for plain error. See United States v. Romero, 491 F.3d 1173, 1177-78 (10th Cir. 2007) (discussing the requirement of raising procedural objections in front of the sentencing court). "We find plain error only when there is (1) error, (2) that is plain, (3) which affects substantial rights, and (4) which seriously affects the fairness, integrity, or public reputation of judicial proceedings." Id. at 1178. "The plain error standard presents a heavy burden for an appellant, one which is not often satisfied." Id.

We conclude, for two reasons, that no error, let alone plain error, occurred in this case. First, the holding in James is inapplicable to Crowe's appeal because of a key factual difference in the two cases: in James, the district court "refused to consider the successor lenders as victims" based on its factual finding that the decision to resell the original loans was not foreseeable to the defendant (a finding, we note, that was not challenged by the government on appeal); in Crowe's case, the district court made no such finding. Second, and relatedly, both James and our more recent decision in United States v. Smith, 705 F.3d 1268 (10th Cir. 2013), support the proposition that "where losses to both original and successor lenders is foreseeable," a district court can calculate loss simply by

25

subtracting the foreclosure sales price from the amount of the outstanding balance on the loan. 705 F.3d at 1276. In other words, "the number of lenders involved and the amount of profit made by the original lender or any intermediate lenders is mathematically irrelevant to the calculation of" loss under § 2B1.1. Id. (internal quotation marks omitted).

*The district court's denial of Crowe's motion for new trial*

In her second issue on appeal, Crowe argues that the district court erred in denying her motion for new trial, in which she alleged that she received ineffective assistance because her trial counsel stipulated, over her express objection, to the jurisdictional element of the wire fraud counts.

*a) Background facts relevant to this claim*

On the first day of Crowe's trial, the government began its presentation of evidence by "offer[ing] a stipulation between the parties, . . . Exhibit 28." ROA, Vol. 3 at 133. Exhibit 28 stated, in pertinent part, that the parties stipulated to the following facts regarding the eight interstate wire transfers that formed the basis of Counts 9 through 16 of the indictment (i.e., the wire fraud counts):

1. On February 9, 2006, $766,465.89 was wired interstate, via the Federal Reserve's Fedwire system, from Aegis Mortagage's [sp] JPMorgan Chase account to Lawyer's Title's account at Vectra Bank in Denver, CO in order to fund the 1st Mortgage on 1321 Colt Circle, Castle Rock, CO;

2. On April 20, 2006, $944,525.55 was wired interstate, via the Federal Reserve's Fedwire system, from Lending 1st Funding's account at Wachovia Bank North America to Security Title Guaranty

26

Company's account at Centennial Bank in Colorado in order to fund the 1st Mortgage on 7818 S. Zeno Street, CO;

3.  On April 20, 2006, $310,713.91 was wired interstate, via the Federal Reserve's Fedwire system, from Lending 1st Funding's account at Wachovia Bank North America to Security Title Guaranty Company's account at Centennial Bank in Colorado in order to fund the 2nd Mortgage on 7818 S. Zeno Street, CO;

4.  On May 18, 2006, $31,180 was wired interstate, via the Federal Reserve's Fedwire system, from Stewart Title of Denver's account at Guaranty Bank and Trust in Denver, Colorado to Colorado Choice Properties, Inc.'s account at Bank of the West;

5.  On July 25, 2006, $349,646.64 was wired interstate, via the Federal Reserve's Fedwire system, from Lehman Brothers Bank's account at JPMorgan Chase to Land Title, LLC's account at First Bank in Colorado in order to fund the 1st Mortgage on the refinance of 6183 S. Ventura, Denver, CO;

6.  On July 25, 2006, $87,435.99 was wired interstate, via the Federal Reserve's Fedwire system, from Lehman Brothers Bank's account at JP Morgan Chase to Land Title, LLC's account at First Bank in Colorado in order to fund the 2nd Mortgage on the refinance of 6183 S. Ventura Court, Denver, CO;

7.  On November 13, 2006, $691,150.94 was wired interstate, via the Federal Reserve's Fedwire system, from Fieldstone Mortgage's account at City Bank to First American Heritage Title Company's account at Centennial Bank in Englewood, CO in order to fund the 1st Mortgage on 948 Logan Street, Denver, CO; and

8.  On November 13, 2006, $170,712.01 was wired interstate, via the Federal Reserve's Fedwire system, from Fieldstone Investment Mortgage's account at City Bank to First American Heritage Title's account at Centennial Bank in Englewood, CO in order to fund the 2nd Mortgage on 948 Logan Street, Denver, CO.

Aplee. Br., Attachment C at 1-3.

The district court admitted Exhibit 28 without any objection from defense

counsel.  On the second day of trial, the prosecutor published Exhibit 28 to the jury.  Crowe's trial counsel again asserted no objection to the exhibit.

After trial, Crowe filed a pro se motion arguing, in pertinent part, that she was entitled to a new trial pursuant to Fed. R. Crim. P. 33 because she "did not authorize [her trial counsel] to sign the Stipulation," and in fact "adamantly objected to it."  ROA, Vol. 2 at 131.  Crowe argued that "[t]his constitute[d] a very blatant violation of her Sixth Amendment right to effective counsel" and "fundamentally denied [her] the right to a fair trial."[6]  Id.

On October 10, 2012, approximately two weeks after sentencing, the district court issued an opinion and order denying Crowe's pro se motion.  At the outset of its opinion, the district court concluded that "[n]one of the concerns . . . that might caution against pre-appeal consideration of" allegations of ineffective assistance of trial counsel were present in this case, and thus it proceeded to "entertain[] the motion" on the merits.  Id. at 179.  With respect to the merits, the district court first concluded that the "concession of a minor element of the offense" by trial counsel, over a defendant's objection, "is not the functional equivalent of a guilty plea where, as indisputably happened here, trial counsel vigorously contested the more significant elements of the offense."  Id. at 183 (internal quotation marks omitted).  Relatedly, the district court concluded "that

---

[6] Crowe's motion asserted other claims of ineffective assistance of trial counsel, but none of those are at issue in this appeal.

28

there [wa]s no clear authority establishing that a trial counsel's decision to stipulate to a jurisdictional element like the use of interstate wires, over the defendant's objection, constitutes per se ineffective assistance." Id. at 185. "[I]ndeed," the district court concluded, "the most on-point authority appears to suggest just the opposite." Id. In turn, the district court concluded that, even assuming Crowe could establish her trial counsel performed deficiently by entering into the stipulation, she could not establish that she was prejudiced by that deficient performance. In support, the district court noted that Crowe "ha[d] not come forward with any evidence" establishing that the mortgage transactions at issue did not involve the use of interstate wires. Id. at 186. Further, the district court noted that, "notwithstanding the stipulation, the Government here presented some evidence of wire transactions relating to [Crowe's] scheme: the Government introduced Exhibit 278, a wire transfer confirmation that is the subject of paragraph 2 of the stipulation, demonstrating the wiring of funds from New York to the closing agent; and Exhibit 279, a wire transfer confirmation relating to the property at issue in paragraph 3 of the stipulation, reflecting the transfer of funds from New York to the closing agent." Id. at 186-87.

   *b) Analysis of the district court's decision*

   We review the district court's denial of a motion for a new trial for abuse of discretion. United States v. McKeighan, 685 F.3d 956, 973 (10th Cir. 2012). A district court abuses its discretion if its adjudication of a claim is based upon an

29

error of law or a clearly erroneous finding of fact.  United States v. Lujan, 603

F.3d 850, 861 (10th Cir. 2010).

Generally, claims of ineffective assistance of trial counsel should be

brought on collateral review "so that a factual record enabling effective appellate

review may be developed in the district court."  United States v. Hamilton, 510

F.3d 1209, 1213 (10th Cir. 2007).  We have recognized a narrow exception to this

general rule, however, "where the record before us allows for a fair evaluation of

the merits of the claim."  United States v. Sands, 968 F.2d 1058, 1066 (10th Cir.

1992).

In this case, the district court rejected Crowe's ineffective assistance claim

on the merits without conducting an evidentiary hearing.  In doing so, the district

court effectively concluded that the claim, including the prejudice prong of

Strickland v. Washington, 466 U.S. 668 (1984), could be resolved on the basis of

the trial record alone.  Based upon our review of the record on appeal, we agree

with the district court's conclusion and in turn conclude that we may properly

review Crowe's claim of ineffective assistance on direct appeal.

Applying the standards outlined in Strickland to the facts before us, we

conclude that there is no need to assess in detail Crowe's arguments and

allegations regarding Strickland's performance prong.  Even if we were to assume

that Crowe's trial counsel performed deficiently by entering into the stipulation

over Crowe's objection, the critical question is whether, under Strickland's

30

prejudice prong, Crowe can demonstrate a reasonable probability that, but for her trial counsel's allegedly deficient performance, the result of the trial would have been different.

As we have noted, the district court concluded that Crowe could not demonstrate prejudice for two related reasons: because there was no evidence remotely suggesting that the transactions that formed the basis of Counts 9 through 16 of the indictment did not involve the use of interstate wires, and because the government's evidence at trial, aside from the stipulation, effectively established the wire transactions at issue. Notably, Crowe does not dispute either of these conclusions. Instead, she argues that her trial counsel's stipulation was per se prejudicial "because it left [her] entirely without counsel in contesting the element of the wire-fraud offenses to which trial counsel stipulated." Aplt. Br. at 13. But a review of the record on appeal clearly establishes that Crowe's trial counsel did not "entirely fail[] to subject the prosecution's case to meaningful adversarial testing," as would be necessary for us to properly dispense with the necessity of Crowe making a "specific showing of prejudice" under Strickland. United States v. Cronic, 466 U.S. 648, 659 (1984). Indeed, aside from the stipulated jurisdictional element, the record establishes that Crowe's trial counsel vigorously represented Crowe in challenging the government's evidence on the wire fraud counts, particularly the key question of whether Crowe acted with specific intent to defraud or to obtain money or property by means of false

31

pretenses, representations or promises.

Consequently, we conclude that Crowe has failed to establish that she is entitled to a new trial on the basis of her ineffective assistance of counsel claim.

III

The judgment of the district court is AFFIRMED.